## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

CENTRAL PENNSYLVANIA TEAMSTERS : <br>
PENSION FUND, *et al.*, : <br>
      Plaintiffs, : <br>
       : <br>
      v. :     Civil No. 5:20-cv-05560-JMG <br>
       : <br>
BYRON WAGGONER, *et al.*, : <br>
      Defendants. : <br>

---

## MEMORANDUM OPINION

**GALLAGHER, J.**                                **December 15, 2022**

### I.   OVERVIEW

Plaintiffs, Central Teamsters Pension Fund and Trustees, seek to recover ERISA withdrawal liability damages assessed against non-party former employer The York Concrete Company. Plaintiffs allege Defendants are liable for these damages following the sale of The York Concrete Company's assets to Defendant York Concrete Company, LLC. Before the Court are the parties' dual motions for summary judgment as to Counts I and II of Plaintiffs' Amended Complaint. For the following reasons, Defendants' motion for summary judgment is denied, and Plaintiffs' motion for summary judgment is granted in part and denied in part.

### II.   BACKGROUND

#### a.   Procedural Background

This successor liability action arises from Defendant York Concrete Company, LLC's ("YCC") asset purchase of a former company, The York Concrete Company ("York"). *See* Defendants' Statement of Facts [hereinafter "DSOF"] at ¶ 10 (ECF No. 55-2); Plaintiffs' Statement

of Facts [hereinafter "PSOF"] at ¶ 5 (ECF No. 57). Plaintiffs, the Central Pennsylvania Teamsters Pension Fund (hereinafter the "Fund" or "Plaintiffs"), allege YCC and the other Defendants are joint and severally liable for $193,363.00 in Employee Retirement Income Security Act ("ERISA") withdrawal liability, among other related costs, assessed against York. *See* Amended Compl. (ECF No. 23). The "Defendants" consist of: Byron Waggoner; York Concrete Company, LLC; Waggoner Holdings, LLC; Waggoner Holdings, LP; Girard Avenue Holdings, LLC; Waggoner Construction, Inc.; Waggoner Fabrication & Millwright, LLC; Waggoner Roofing, LLC; Best Mechanical Services, LLC; and Crane Werks, LLC. Before the Court are the parties' Dual Motions for Summary Judgment (ECF Nos. 55 and 56) as to Counts I and II of Plaintiffs' Amended Complaint.

Count I of Plaintiffs' Amended Complaint brings a federal common law successor liability claim against Defendant YCC only. *Id.*

Count II of Plaintiffs' Amended Complaint brings a separate successor liability claim against Defendants Waggoner Holdings, LLC; Waggoner Holdings, LP; Girard Avenue Holdings, LLC; Waggoner Construction, Inc.; Waggoner Fabrication & Millwright, LLC; Waggoner Roofing, LLC; Best Mechanical Services, LLC; and Crane Werks, LLC. *See* Amended Compl. (ECF No. 23). Plaintiffs allege these Defendants, along with Defendant YCC, belong to a brother-sister controlled group of entities, which Plaintiffs refer to as the "Waggoner Entities," because Defendant Byron Waggoner ("Mr. Waggoner") has a "controlling interest" in each of the entities. *Id.* Plaintiffs contend that because Mr. Waggoner has both a "controlling interest" in each of the entities and exerts "effective control" over each of the entities, the Waggoner Entities collectively

constitute a single employer under ERISA such that each entity is jointly and severally liable for York's withdrawal liability, and all other amounts owed to the Fund. *Id.*

Count III of Plaintiffs' Amended Complaint alleges Defendant Mr. Waggoner is jointly and severally liable with the Waggoner Entities for York's withdrawal liability because the Waggoner Entities are the "alter ego" of Mr. Waggoner. *Id.* Pursuant to this Court's August 24, 2022 Order, Count III is not presently before the Court.[1]

Plaintiffs and Defendants each filed motions for summary judgment on October 3, 2022.[2] ECF Nos. 55 and 56. The Parties filed responses in opposition on October 17, 2022. ECF Nos. 58 and 60. Plaintiffs filed a Reply in Support of Their Motion for Summary Judgment on October 25, 2022. ECF No. 64.

**b. The Asset Purchase Agreement**

York was a concrete manufacturer that owned and operated a manufacturing facility at 400 Girard Avenue, York, Pennsylvania, 17403. PSOF ¶ 1-2 (ECF No. 57); Defendant's Response to Plaintiffs' Statement of Facts [hereinafter "DRPSOF"] at ¶ 1-2 (ECF No. 59). As part of its operations, York employed delivery drivers who were, for purposes of collective bargaining,

---

[1] *See* ECF No. 54 (setting deadline for motions for summary judgment on all issues except for the issue of piercing Defendants' corporate veils and instructing that if Plaintiffs' prevail on motions for summary judgment as to Counts I and II, the parties must meet and confer to discuss discovery on the issue if necessary following the Court's ruling on the parties' motions for summary judgment).

[2] While titled "Defendants York Concrete Company, LLC's Motion for Summary Judgment" (ECF No. 55), the Motion is submitted by all Defendants and accompanied by "Defendants' Brief In Support of Motion For Summary Judgment."

represented by a local affiliate of the International Brotherhood of the Teamsters. PSOF at ¶ 3; DRPSOF at ¶ 3. York contributed to the Fund for those drivers. PSOF at ¶ 3; DRPSOF at ¶ 3.

YCC is 100 percent owned by its sole member, Defendant Mr. Waggoner. PSOF at ¶ 10, 17; DRPSF at ¶ 10, 17. Around 2016, Mr. Waggoner began the process of acquiring York's assets on behalf of Defendant YCC. DSOF at ¶ 13; Plaintiff's Response to Defendants' Statement of Facts [hereinafter "PRDSOF"] at ¶ 13. With this asset sale to YCC impending, York stopped making contributions to the Fund in 2017. PSOF at ¶ 5; DRPSF at ¶ 5. Thereafter, the Fund sent a written assessment dated May 1, 2018 to York, notifying York that this cessation of contributions effectuated a complete withdrawal from the Fund under the Employee Retirement Income Security Act of 1974 ("ERISA") and Section 4203(a) of the Multiemployer Pension Plan Amendments Act ("MPPAA"), and therefore York owed $193,363 in withdrawal liability to the Fund ("May 1, 2018 Assessment"). Joint App. at JA 0029-0030 (ECF No. 57-2). York received the May 1, 2018 Assessment and was aware of this withdrawal liability. PSOF at ¶ 10; DRPSOF at ¶ 10. York and its representatives never responded in writing to the May 1, 2018 Assessment. PSOF at ¶ 11; DRPSOF at ¶ 11.

On July 22, 2019, Plaintiff, the Fund, obtained a judgment award of $193,363.00 against York in withdrawal liability, plus awards of interest, liquidated damages, and attorneys' fees and costs for a total award of $278,978.90 (the "Judgment"). JA 0250-0258 (ECF No. 57-2). To date, York has not made any payments toward the withdrawal liability or total Judgment. *Id.* at JA 0004.

The parties do not dispute that Defendant YCC became aware of the May 1, 2018 Assessment and York's withdrawal liability in May 2018. DSOF at ¶ 74; PRDSOF at ¶ 74; Waggoner Dep. at 142:8-143:1; JA 0205-0206 (ECF No. 57-2).

It is further undisputed that on July 3, 2018, YCC signed a written asset purchase agreement for York's assets ("Written Asset Purchase Agreement" or "the Agreement"). PSOF at ¶ 35; DRPSF at ¶ 35. The Agreement contains a provision stating the parties intend to be legally bound to its terms. *See* JA 0331, 0333, 0337 (ECF No. 57-2). The Agreement defines the "Acquired Assets" as consisting of York's inventory, equipment, and intangible assets. JA 0331 (ECF No. 57-2). The Agreement contains a Pennsylvania choice of law provision. JA 0343 (ECF No. 57-2). Critically, The Agreement contains a provision titled "Entire Agreement," which states:

> This Agreement, including the Schedules and Exhibits attached hereto and the documents referred to herein shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof and shall supersede all previous oral and written negotiations, commitments and writings with respect to the subject matter of this Agreement.

JA 0344 (ECF No. 57-2).

Defendants contend that before YCC and Mr. Waggoner became aware of York's withdrawal liability and of the May 1, 2018 Assessment, the terms of the asset purchase agreement were finalized via a "handshake agreement which occurred upon in late 2017 or early 2018" (the "Handshake Agreement"). DSOF at ¶ 15. Indeed, Defendants claim that, by December 2017, YCC had already tendered payment of $250,000.00 in connection with this Handshake Agreement. DSOF at ¶ 18. According to Mr. Waggoner, the $250,000.00 payment was "for some trucks and an old loader" owned by York. Waggoner Dep. at 56:21-57:5; JA 0119-0120 (ECF No. 57-2). Moreover, according to Defendants, YCC began to operate out of York's facility by the end of

April or beginning of May 2018. DSOF at ¶ 23; Waggoner Dep. at 88:2-14; JA 0151 (ECF No. 57-2).

Therefore, Defendants contend YCC agreed to purchase York's assets "in late 2017" via the Handshake Agreement, that "both parties tendered consideration in segments" and YCC moved into York's property, but that the Handshake Agreement was "never reduced to writing until July 2018 but the terms remained the same." Defendants' Response at numbered pg. 5 (ECF No. 58). According to Defendants, the July 3, 2018 Written Asset Purchase Agreement "merely memorialized" the earlier Handshake Agreement. DSOF at ¶ 25.

Plaintiffs dispute whether the Handshake Agreement took place. PRDSOF at ¶ 15. However, Plaintiffs admit that YCC did tender a $250,000.00 payment to York and began operating out of York's manufacturing facility prior to execution of the Written Agreement. PRDSOF at ¶ 18; 20.

### c.  YCC's Operations Following the Asset Purchase

The parties do not dispute the facts surrounding YCC's operations. YCC is in the same business as York: concrete manufacturing. PSOF ¶ 42; DRPSOF at ¶ 41-42. YCC operates out of the same plant and location that York did: the commercial property located at 400 Girard Avenue, York, Pennsylvania, 17403. PSOF ¶ 1-2; DRPSOF at ¶ 1-2.

YCC holds itself out as a continuation of York. YCC still uses York's former trade name, "York Concrete Company," a right YCC obtained from the asset purchase agreement. PSOF ¶ 48; DRPSOF at ¶ 48. Indeed, YCC posted signage at the 400 Girard Avenue property advertising the company "has been pouring mud since 1944"; a reference to both the old York Concrete Company

6

and YCC. PSOF ¶ 49; DRPSOF at ¶ 49; Waggoner Dep. at 120:16-121:19, JA 0183-1084 (ECF No. 57-2). Similarly, YCC's website states the company "was established in 1944" and "is the first and oldest ready mix concrete company." PSOF ¶ 50; DRPSOF at ¶ 49. Moreover, YCC still uses the same telephone number as York. PSOF ¶ 1-2; DRPSOF at ¶ 50.

Prior to the asset purchase, YCC did not own any equipment, vehicles, or physical assets. PSOF ¶ 43; DRPSOF at ¶ 43. YCC purchased all of York's equipment and vehicles, except for the former owners' personal vehicles. PSOF ¶ 44; DRPSOF at ¶ 44.

However, much of the acquired equipment is no longer used today. Of the thirteen trucks acquired from York, four were immediately junked, and only five are operable today. DSOF ¶ 50-51; PRDSOF ¶ 50-51. Since the asset sale, YCC bought ten new trucks, replaced York's loader and concrete forms, cleaned the old equipment systems, purchased new batching system equipment, purchased a forklift and a sweeper, and implemented a new silo. DSOF ¶ 55-59; PRDSOF ¶ 55-59.

It took YCC four months to clean, upgrade, and replace equipment before it was able to begin offering services or products. DSOF ¶ 38; PRDSOF ¶ 38. At the time of the sale, York was unable to supply concrete in a fashionable time and did not have any pending work orders. DSOF ¶ 32; PRDSOF ¶ 32; Defendants' Brief at pg. 26 (ECF No. 55-1); Plaintiffs' Response at numbered pg. 11 (ECF No. 60).

YCC retained four of York's five customers. DSOF ¶ 66-67; PRDSOF ¶ 66-67. These customers purchase concrete from YCC "roughly once a month or every other month." DSOF ¶ 67; PRDSOF ¶ 67. Within a year of the sale, YCC added 13 new customers, who purchase product

on a daily basis. DSOF ¶ 68; PRDSOF ¶ 68. It is undisputed that, at the time of the sale, York would not have been able to meet these new customers' high volume demands. DSOF ¶ 71; PRDSOF ¶ 71. Initially, Defendant Waggoner Construction purchased 75 percent of YCC's concrete. DSOF ¶ 65; PRDSOF ¶ 65.

At the time of the asset sale, York had only one employee, Mr. Dennis Schaul. Waggoner Dep. at 45:3-45:11, JA 0108; Defendants' Brief at pg. 26 (ECF No. 55-1); Plaintiffs' Brief at pg. 15 (ECF No. 56-1). Now, Mr. Schaul is technically employed by Waggoner Construction. DSOF ¶ 42-46; PRDSOF ¶ 42-46. However, Mr. Waggoner is the sole member and 100 percent owner of the Waggoner Entities, including both YCC and Waggoner Construction. PSOF ¶ 17, 21 (ECF No. 55-2); DRPSOF ¶ 17, 21 (ECF No. 61). Approximately 70-75 percent of Mr. Schaul's time is spent working on behalf of YCC. DSOF ¶ 48; PRDSOF ¶ 48. Currently, roughly 15-20 individuals are employed by Waggoner Construction and perform work for YCC. DSOF ¶ 49; PRDSOF ¶ 49. York did not have any active managers at the time of the asset sale, and its owners are not employed by YCC. Defendants' Brief at pg. 26 (ECF No. 55-1); Plaintiffs' Response at numbered pg. 11 (ECF No. 60).

## III.   LEGAL STANDARD

Summary Judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts "should consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion." *Beenick v. Lefebvre*, 684 Fed. Appx. 200, 205 (3d. Cir. 2017). "If review of a cross motion for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law

and undisputed facts." *Briglia v. Horizon Healthcare Servs.*, No. 03-6033, 2007 U.S. Dist. LEXIS 48115 at \*14 (D. N.J. July 3, 2007).

However, if any facts in the record, or inferences that may be drawn from them, reveal the existence of an issue of material fact, then summary judgment is improper. *Wetzel v. McDonnell Douglas Corp.*, 491 F. Supp. 1288, 1293 (E.D. Pa. 1980). Such is true even if both parties seek summary judgment and agree the court can "resolve all the liability issues on the evidence already before it." *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d. Cir. 2008) ("the mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have a case presented to a jury.") (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998), at 330-31)). "Although it might seem to serve principles of judicial economy, parties may not stipulate to forgoing a trial when genuine issues of material fact remain that prevent either side from succeeding on a motion for summary judgment." *Id.*

In considering a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d. Cir. 2001). A court should not grant summary judgment "where the record could lead reasonable minds to draw conflicting inferences." *In re Weiand Auto. Indus.*, 612 B.R. 824, 838 (Bankr. D. Del. 2020) (quoting *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002)) (internal quotations omitted). A court should grant summary judgment "only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party." *Id.* A court may not grant summary judgment by weighing competing evidence or facts. *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1024 (3d. Cir. 2008) (holding

district court improperly weighed competing evidence, as multifactor test to evaluate Lanham Act claims was a "fact-intensive inquiry" that "should have been handled at trial.").

## IV.    ANALYSIS

### a.   Count I: Federal Common Law Successor Liability against YCC

Count I of Plaintiffs' Amended Complaint brings a federal common law successor liability claim against YCC for the withdrawal liability of York under ERISA, as amended by the MPPAA. Amended Compl. (ECF No. 23).

One of the "principal purposes" behind the Employee Retirement Income Security Act of 1974 ("ERISA") is to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 193 (3d Cir. 2009) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)). "Indeed, Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it." *Id.* (quoting *Pension Benefit Guar. Corp.*, 467 U.S. at 193) (internal quotations omitted).  To further effect this guarantee, congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which amends ERISA "out of concern that multiemployer pension plans would collapse as employers withdrew if the remaining contributors became too few in number to pay the unfunded vested benefits." *Local Union 1158 I.B.E.W. Pension Fund-Pa v. H.H. Fluorescent Parts, Inc.*, No. 06-5171, 2008 U.S. Dist. LEXIS 14980 at *12 (E.D. Pa. Feb. 27, 2008) (quoting *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 139 (3d Cir. 1997)). The MPPAA "mandates that

an employer withdrawing from a multiemployer pension plan pay 'withdrawal liability,' which is equivalent to the employer's proportionate share of the plan's unfunded vested benefits." *Id.* (citing 29 U.S.C. §§ 1381, 1391).

"[B]ecause ERISA and the MPPAA are remedial statutes, they 'should be liberally construed in favor of protecting the participants in employee benefit plans.'" *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 98 (3d Cir. 2011) (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)). In *Einhorn* the Third Circuit held "a purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy" if the following two elements are met: (1) "the buyer had notice of the liability prior to the sale" and (2) "there exists sufficient evidence of continuity of operations between the buyer and seller." *Id.* at 99. This inquiry should be made on a "case by case basis." *Id.*

### i. Defendant YCC Had Actual Notice of York's Withdrawal Liability Prior to the Asset Sale

Whether the buyer had notice of the liability prior to the sale "centers on whether the buyer knows about the debts, not whether the buyer knows that the funds intend to seek recovery from it." *Einhorn*, 632 F.3d at 99. The "notice requirement is animated by concerns that it is inequitable to impose successor liability upon an innocent purchaser who did not have an opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price." *Tsareff v. Manweb Servs.*, 794 F.3d 841, 849 (7th Cir. 2015). "Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Teamsters Local 469 Pension Fund*

*v. J.H. Reid Gen. Contrs.*, No. 15-06185, 2020 U.S. Dist. LEXIS 192893 at *18 (D. N.J. Oct. 16, 2020) (quoting *Upholsters' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990)).

Here, the parties do not dispute that the predecessor company, York, is subject to withdrawal liability. York stopped making contributions to the Fund in 2017. PSOF at ¶ 5; DRPSOF at ¶ 5. Consequently, the Fund notified York via the May 1, 2018 Assessment of the $193,363 in withdrawal liability it owed to the Fund. JA 0029-0030 (ECF No. 57-2). On July 22, 2019, the Fund obtained Judgment against York for the withdrawal liability, plus liquidated damages and additional costs. JA 0250-0258 (ECF No. 57-2).

It is undisputed that YCC became aware of the May 1, 2018 Assessment and York's withdrawal liability in May 2018. DSOF at ¶ 74; PRDSOF at ¶ 74; Waggoner Dep. at 142;8-143:1, JA 0205-0206 (ECF No. 57-2). Two months later, on July 3, 2018, YCC signed the Written Asset Purchase Agreement to purchase York's inventory, equipment, and intangible assets. PSOF at ¶ 35; DRPSOF at ¶ 35, JA 0331, 0333, 0337 (ECF No. 57-2).

YCC contends it is entitled to summary judgment on Plaintiffs' claim because, according to Defendants, prior to YCC receiving notice of the withdrawal liability, the parties had already finalized the asset purchase for a total of $650,000 via the Handshake Agreement in "late 2017 or early 2018." Defendants' Brief at pg. 21 (ECF No. 55-1). The Written Agreement, Defendants contend, "merely memorialized" the Handshake Agreement, and the price could not be changed after the Handshake Agreement because the terms were final. *Id.* at pg. 22; DSOF at ¶ 25. Indeed, it is undisputed that YCC and York began discussing the sale in early 2016, long before the Written

Agreement was executed. DSOF at ¶ 13; PRDSOF at ¶ 13. Moreover, it is undisputed that by December 2017, YCC tendered a $250,000.00 payment to York. DSOF at ¶ 18; PRDSOF at ¶ 18.

Plaintiffs dispute whether the Handshake Agreement took place. PRDSOF at ¶ 15. However, Plaintiffs' claim it is immaterial whether the Handshake Agreement actually occurred, because any such agreement was invalidated by Pennsylvania's Statute of Frauds as well as the Written Agreement's integration clause, which provides that the Written Agreement supersedes all prior agreements concerning the asset purchase. *See* Plaintiffs' Response at numbered pg. 5-6 (ECF No. 60).

The Court finds that a genuine issue of material fact exists as to whether the parties finalized the asset sale via the Handshake Agreement, as the existence and scope of the Handshake Agreement are in dispute and unclear from the record. Defendants' assertion that the Handshake Agreement consisted of terms identical to the subsequent Written Agreement appears supported solely by the testimony of Mr. Waggoner and is disputed by Plaintiffs. DSOF ¶ 15, 25; PRDSOF ¶ 15. While Plaintiffs do not dispute that YCC tendered $250,000.00 to York in December 2017, the scope of the payment and alleged Handshake Agreement is unclear. Mr. Waggoner testified the payment "was for some of the trucks – in the beginning we gave them $250,000 for some trucks and an old loader. Then we finished up with the assets – buying the assets on – in July." Waggoner Dep. at 56:24-57-3, JA 0119-0120 (ECF No. 57-2). From this testimony, it is unclear whether the subject matter of the Handshake Agreement and corresponding $250,000.00 payment was limited to just some of York's equipment, namely "some trucks and an old loader," or whether the Handshake Agreement, as Defendants contend, contemplated all of York's assets, and the $250,000.00 payment was a partial or installment payment of the total purchase price for all assets.

However, any factual dispute concerning the existence and scope of the Handshake Agreement is ultimately immaterial. Even if, as Defendants aver, the Written Agreement "merely memorialized" the earlier Handshake Agreement, it is *the Written Agreement* that exclusively binds YCC to the asset sale because it contains an unambiguous integration clause.[3] The integration clause states "This Agreement…shall constitute the entire agreement between the parties…and shall supersede all previous oral and written negotiations, communications and writings with respect to the subject matter of this Agreement." JA 0344 (ECF No. 57-2). When the parties to a contract "adopt a writing as the final and complete expression of their agreement…[a]lleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written agreement are merged in or superseded by that contract." *McGuire v. Schneider, Inc.*, 534 A.2d 115, 117 (Pa. Super. Ct. 1987). *See also Lovelace v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 874 A.2d 661, 667 (Pa. Super. Ct. 2005) (presence of integration clause in written contract rendered prior oral settlement "a legal nullity"); *Sullivan v. Sovereign Bancorp, Inc.*, 33 Fed. Appx. 640, 642 (3d Cir. 2002) (appellants were "precluded from introducing evidence of prior oral promises" where written agreement was "fully integrated."); *Sköld v. Galderma Labs. L.P.*, 917 F.3d 186, 194 (3d Cir. 2019) ("integration clauses

---

[3] Plaintiffs' also contend the Handshake Agreement is rendered invalid by the Pennsylvania Statute of Frauds. However, because YCC also tendered a $250,000.00 payment and York transferred some physical assets to YCC in connection with the Handshake Agreement, the Court declines to grant summary judgment on these grounds. *See Calderwood v. Rinsch*, No. 22-2847, 2022 U.S. Dist. LEXIS 213305 at *10 (E.D. Pa. Nov. 28, 2022) (holding evidence of "partial payment takes the alleged contract out of the ambit of the statute of frauds."); *Moss v. Aaron's, Inc.*, No. 14-3753, 2015 U.S. Dist. LEXIS 58518 at *6-7 (E.D. Pa. May 5, 2015) (holding receipt of equipment in exchange for partial payment on the equipment, if proven at trial, "would take the contract outside the statute of frauds."); 13 Pa. Cons. Stat. § 2201(c) (providing contract subject to Pennsylvania Statute of Frauds is nevertheless enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted.").

are meant to act as 'conclusive evidence that the parties intended to supersede any prior contract *on the same subject matter*'") (emphasis in original) (quoting *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002)).

The Written Asset Purchase Agreement is valid and controlling even if, as Defendants aver, it "merely memorialized" identical terms previously agreed to in the Handshake Agreement. The Written Agreement contains a statement that the parties intend to be legally bound to its terms. JA 0331, 0333, 0337 (ECF No. 57-2). Under Pennsylvania's Uniform Written Obligations Act, a signed written contract is not invalid or unenforceable for lack of consideration. 33 P.S. § 6. In *McGuire*, the appellee argued a written agreement containing a merger clause was invalid because the agreement "gave him nothing that he did not already have" in an earlier agreement executed six months prior. *McGuire v. Schneider, Inc*., 368 Pa. Super. 344, 350 (Pa. Super. Ct. 1987). The Pennsylvania Superior Court held that because the written agreement contained both a merger clause and an expression of the parties' intention to be bound, the agreement was valid and superseded the agreement from six months prior, as it was the "sole enforceable agreement between the parties." *Id.* at 353.

Similarly, in *Rezai*, the court held that a written contract containing an integration clause stating "[t]his represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or not" precluded any reliance on an oral agreement allegedly containing "near identical terms and subject matter" and "entered into contemporaneously with the" written contract. *Cultiv8 Interests, LLC v. Rezai*, No. 2:20-cv-05290, 2021 U.S. Dist. LEXIS 250924 at *10 (C.D. Cal. Feb. 23, 2021). "Indeed," the court reasoned, "what would be the point of requiring a signature on a document if

a mere oral assent were enough to bind contracting parties?" *Id.* at *10. *See also Fusco v. Ins. Planning Ctr.*, No. 05-1245, 2008 U.S. Dist. LEXIS 141644 at *11-12 (D. Kan. Apr. 30, 2008) ("[w]hen the parties want to memorialize prior verbal agreements, a contract is created to write down all the terms and conditions that are part of the agreement, and the merger clause has the effect of making any terms in the agreement the only terms by which the parties are bound…[w]hen a dispute arises over terms that are not included in the contract, if the court determines the contract is complete and unambiguous, parol evidence of a prior agreement will not be admitted to determine the intent of the parties.") (internal citations omitted).

In *William F. Shea, LLC v. Bonutti Research, Inc.*, the court rejected a defendant's argument that a previous oral agreement survived a written contract notwithstanding the written contract's integration clause. *William F. Shea, LLC v. Bonutti Research, Inc.*, No. 2:10-cv-615, 2012 U.S. Dist. LEXIS 149971 at *39-40 (S.D. Ohio Oct. 18, 2012). The defendant argued the parties' previous oral agreement survived the integrated written agreement, because the written agreement contained a recital stating the parties "intended to memorialize the existing agreement of the parties with respect to the matters set forth in this Agreement." *Id.* at *39. The court rejected this "attempt to achieve an end run around the parol evidence rule," holding "[t]he rule cannot be so easily sidestepped through a run-of-the-mill recital that states what most, if not all, written agreements do (i.e. memorialize an agreement previously reached by the parties)." *Id.* at *40.

Therefore, the parties are bound exclusively by the Written Asset Purchase Agreement executed on July 3, 2018. Any prior oral agreements are not enforceable and are expressly contemplated by the Written Agreement's integration clause.  Because YCC received notice of the

withdrawal liability in May 2018, before assenting to the Written Agreement, YCC had notice of York's withdrawal liability prior to the asset sale as a matter of law.

### ii. There is a Genuine Issue of Material Fact as to Whether YCC Has Substantially Continued York's Operations Since the Asset Sale

In assessing whether there is "substantial continuity" between enterprises, the Supreme Court held courts may consider "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987).

"However, the Courts of Appeals have grouped these considerations slightly differently, or emphasized certain factors more than others, depending on the statutory scheme to be vindicated and the circumstances of the case." *New York State v. C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 178 (2d Cir. 2022).

In this context, assessing whether an asset purchaser is liable for a seller's ERISA withdrawal liability, the Third Circuit identified six factors to evaluate when considering the substantial continuity element: (1) "continuity of the workforce"; (2) "management"; (3) "equipment and location"; (4) "completion of work orders begun by the predecessor"; and (5) "constancy of customers." *Einhorn*, 632 F.3d at 99. "The[se] factors are non-exhaustive. Instead, the continuity inquiry is fact-specific and should be based on the totality of the circumstances." *RP Baking LLC v. Bakery Drivers & Salesmen Local 194 Indus. Pension Fund*, No. 10-3819, 2012 U.S. Dist. LEXIS 44875 at *21 (D. N.J. Mar. 30, 2012) (citing *Fall River*, 482 U.S. at 43).

### iii.  *Einhorn* **Factor One: Continuity of Workforce**

This factor militates against a finding of continuity. YCC retained York's sole remaining employee, Mr. Dennis Schaul.[4] However, it is undisputed that Mr. Schaul's job duties changed: for York, he drove a concrete truck – but for YCC, he works as a day laborer cleaning equipment, placing tires on trucks, and performing mechanical work. DSOF at ¶ 43-45; PRDSOF at ¶ 43-35. Moreover, at least 15-20 additional employees now perform work for YCC. DSOF at ¶ 49; PRDSOF at ¶ 49.

In assessing whether there is continuity of the workforce, courts look to both the retention of the predecessor's employees *and* the current composition of the successor's workforce. *See Thompson v. Real Estate Mortg. Newtork*, 748 F.3d 142, 152 (3d Cir. 2014) (allegations that successor employer retained employees "sufficient to demonstrate plausible 'continuity in operations and workforce.'") (quoting *Brzozowski v. Corr. Physician Servs.*, 360 F.3d 173, 178 (3d Cir. 2004)); *but see RP Baking*, 2012 U.S. Dist. LEXIS 44875 at *22 (considering as counterpoint against continuity that 71 of successor's 164 employees had never worked for predecessor entity); *Trs. Of the B.A.C. Local 4 Pension Fund v. Demza Masonry, LLC*, 2021 U.S. Dist. LEXIS 18714 at *13 (D. N.J. Jan. 31, 2021) (finding substantial continuity where predecessor's employees "accounted for 53% of hours worked" by successor employees).

---

[4] The parties do not dispute that, at the time of the asset sale, York had only one employee, Mr. Dennis Schaul. Waggoner Dep. at 45:3-45:11, JA 0108; Defendants' Motion at pg. 26 (ECF No. 55-1); Plaintiffs' Brief at pg. 11 (ECF No. 56-1). Although Mr. Schaul is now technically employed by Waggoner Construction, he spends approximately 70-75 percent of his time working for YCC, and it is undisputed that both Waggoner Construction and YCC are wholly owned by Mr. Waggoner. PSOF ¶ 17, 21; PRDSOF ¶ 42-48; DSOF ¶ 42-48; DRPSOF ¶ 17, 21.

While YCC technically retained 100 percent of York's workforce, this workforce consisted of only one employee whose job duties have subsequently changed. Moreover, a vast majority of individuals working on behalf of YCC did not work for York. Accordingly, this factor militates against a finding of substantial continuity.

### iv. *Einhorn* Factor Two: Continuity of Management

This factor also militates against a finding of continuity. York did not have any active managers at the time of the asset sale, and its owners are not employed by YCC. Because there was not a management team at York, Plaintiffs contend this factor has no relevance to the continuity of operations analysis. *See* Plaintiffs' Response at numbered pg. 11 (ECF No. 60). However, the transition from different owners with no management team to YCC and Mr. Waggoner's ownership and management is indeed a change, and it demonstrates a lack of continuity of management. *See* Defendants' Brief at pg. 26-27 (ECF No. 55-1).

### v. *Einhorn* Factor Three: Equipment and Location

This factor militates in favor of finding continuity. YCC did not own any equipment or physical assets until it purchased all of York's equipment and vehicles, except for the former owners' personal vehicles. PSOF at ¶ 43-44; DRPSOF at ¶ 43-44. While YCC spent four months upgrading and replacing much of this equipment, YCC conducts substantially the same operations, concrete manufacturing, at the same location, 400 Girard Avenue, using much of York's equipment. *See United States EEOC v. Phase 2 Invs. Inc*., 310 F. Supp. 3d 550, 572 (D. Md. 2018) (finding substantial continuity even where successor made "substantive upgrades" to machinery and equipment); *Grant v. Her Imps. NY, LLC*, No. 15-cv-5100, 2018 U.S. Dist. LEXIS 27134 at

19

*55 (E.D.N.Y. Feb. 16, 2018) ("Despite defendants' argument that they have entirely revamped operations and their website, this does not mean that there was a break in the continuity of business operations; rather, it simply means that the business has grown since EZJR formally took over."). Additional factual information absent from the record, such what percentage of York's systems and equipment were kept and used by YCC, could further inform analysis of this factor.

### vi. *Einhorn* Factor Four: Completion of Work Orders Begun by Predecessor

This factor does not militate for or against a finding of continuity. There is no evidence in the record that York had any pending work orders at the time of the asset sale. DSOF ¶ 32; PRDSOF ¶ 32.

### vii. *Einhorn* Factor Five: Constancy of Customers

It is not clear whether this factor militates for or against a finding of continuity. While YCC retained four of York's five customers, YCC added 13 new, higher volume customers within a year of the asset purchase. DSOF ¶ 67-68; PRDSOF ¶ 67-68. Initially, Defendant Waggoner Construction purchased 75 percent of the concrete produced by YCC. DSOF ¶ 65; PRDSOF ¶ 65. It is not clear from the record whether Waggoner Construction still purchases this much concrete from YCC, or what percentage of YCC's current sales or customer base is comprised of former YCC customers. *See Sheet Metal v. Total Air Sys., LLC*, No. 4:13-cv-1451, 2014 U.S. Dist. LEXIS 82971 at *30 (N.D. Ohio June 18, 2014) (declining to grant summary judgment on successor liability claim where it was unclear from the record what "the actual percentage" of the successor's "business is represented by former" customers of the predecessor).

YCC retained a vast majority of York's prior customers, which weighs in favor of continuity. *See Demza*, 2021 U.S. Dist. LEXIS 18714 at *13 (finding substantial continuity existed while noting successor performed work for five former customers of predecessor); *Resilient Floor Covering Pension Trust Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1084 (9th Cir. 2015) (substantial continuity hinges on "whether the new employer has taken over the economically critical bulk of the prior employer's customer base"). However, former York customers appear to comprise a small minority of YCC's current customer base, which weighs against continuity. *New York State v. C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 182 (2d Cir. 2022) (holding that where 70 percent of successor employer's product volume was distributed to successor's own retail stores, this was "a large enough majority, for the purposes of a substantial continuity analysis, to tip the customer continuity question" away from finding continuity of operations). Given these competing considerations, the Court finds that this factor neither militates for or against a finding of substantial continuity.

### viii.  Additional Considerations: YCC Represented Itself as a Continuation of York

The *Einhorn* factors are non-exhaustive. *RP Baking*, 2012 U.S. Dist. LEXIS 44875 at *21 (D. N.J. Mar. 30, 2012) (citing *Fall River*, 482 U.S. at 43). Additional relevant considerations militating in favor of continuity include that YCC still uses York's former trade name and telephone number, and advertises that the company "has been pouring mud since 1944" and "is the first and oldest ready mix concrete company." PSOF ¶ 49-50; DRPSOF ¶ 49-50. Moreover, YCC conducts the same operations, concrete manufacturing, at the same location, 400 Girard Avenue, as The York Concrete Company. *See Demza*, 2021 U.S. Dist. LEXIS 18714 at *13 (finding substantial continuity existed while noting successor performed the "same masonry work"

as predecessor, and "operates from the same Facility"); *Fall River Dyeing*, 482 U.S. at 43 (considering "whether the business of both employers is essentially the same…and whether the new entity has the same production process" as factors in substantial continuity analysis).

### ix. The Element of Substantial Continuity can not be Resolved at the Summary Judgment Stage

The foregoing analysis reveals a relatively even split among, and even within, the factors considered. *Einhorn* factors one and two weigh against finding continuity. Factors four and five do not weigh for or against continuity. Factor three and additional considerations weigh in favor of continuity. At summary judgment, "the role of the court is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *RP Baking*, 2012 U.S. Dist. LEXIS 44875 at *36 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In *RP Baking*, after evaluating the *Einhorn* factors on cross motions for summary judgment, the court held "neither cross movant has satisfied its burden of establishing that no genuine issue of material fact exists as to the issue of continuity" because there was a "split of factors." *Id.* at *36. "Stated differently," the court held it was "unable to determine as a matter of law which of the parties' respective theories of continuity is more credible." *Id.*

Indeed, "[w]here the outcome" of a claim "depends on 'a set of factors to be considered and balanced,' there generally is a 'need for trial,' provided that there are at least two reasonable views of the evidence." *See Members of the Bd. of Admin. of the Toledo Area Indus. UAW Ret. Income Plan v. OBZ, Inc.*, 348 F. Supp. 3d 635, 648 (N.D. Ohio 2018) (quoting *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 609 (7th Cir. 2014)). In *OBZ*, the court held neither party was entitled to summary judgment on the issue of substantial continuity where, "[d]epending on how

one views and weighs the evidence, one might reasonably conclude that" the successor employer "did or did not substantially continue" the predecessor's business. *Id.*

Because the factors are evenly split, to resolve the issue of whether YCC substantially continued York's operations requires the Court to decide which party's theory of continuity is more credible, and to determine which party's evidence it finds more persuasive in proving that theory. Such credibility determinations and weighing of evidence are improper considerations for a court deciding cross motions for summary judgment. *See Grant*, 2018 U.S. Dist. LEXIS 27134 at *56 ("most courts that apply the [substantial continuity] test treat the factors…as questions for the jury.").

      **b.  Count II: The "Waggoner Entities" are Under Common Control Within the Meaning of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA")**

Under ERISA and the MPPAA, a fund may "collect withdrawal liability from any trade or business under common control with the withdrawing organization." *Einhorn v. Apex Equip. Co.*, No. 13-5501, 2014 U.S. Dist. LEXIS 118652 at *12 (E.D. Pa. Aug. 26, 2014). "Businesses under common control are treated as a single entity under ERISA, and are jointly and severally liable for the withdrawal liability of the other entity." *N.J. Bldg. Laborers' Statewide Pension Fund & Trs. Thereof v. CID Constr. Servs., LLC*, No. 15-cv-3412, 2015 U.S. Dist. LEXIS 139628 at *12 (D. N.J. Oct. 14, 2015) (citing ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1)). Entities are "under common control" if they are "either linked by a parent corporation or a group of five or fewer individuals who control 80 percent of a company's voting shares or profits." *Id.* (citing 26 U.S.C. § 1563(a)); *see also GCIU-Employer Ret. Fund v. Harvard Press, Inc.*, No. 16-1074, 2020 U.S. Dist. LEXIS 74817 at *16 (D. N.J. Apr. 28, 2020). In defining "trade or business," courts in this

circuit apply the Supreme Court's definition of "trade or business" in *Groetzinger*, which requires that "to be engaged in a 'trade or business,' a taxpayer must be involved in the activity: (1) with continuity and regularity; and (2) for the primary purpose of income or profit." *Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.*, 765 F. Supp. 2d 710, 715 (E.D. Pa. 2011) (citing *Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23, 35 (1987)); *see also CID Constr. Servs*., 2015 U.S. Dist. LEXIS 139628 at *13.

Courts do not apply *Groetzinger* rigidly, and instead undertake "a factual inquiry to determine whether characterizing an entity as a 'trade or business' will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations." *Holt Marine Terminal*, 765 F. Supp. 2d at 715; *CID Constr. Servs*., 2015 U.S. Dist. LEXIS 139628 at *13.

Here, because a genuine issue of material fact exists as to Count I, Plaintiffs' withdrawal liability claim against YCC, the Court denies Plaintiffs' Motion for Summary Judgment as to Count II in part. However, the Waggoner Entities are trades or business under common control. It is undisputed that all Waggoner Entities, including YCC, are businesses and 100 percent owned by Mr. Waggoner. *See* PSOF ¶ 15-25; DRSOF ¶ 15-25; Defendants' Response at numbered pg. 15 (ECF No. 58). Therefore, should Plaintiff prevail as to Count I at trial, controlled group liability attaches, and the Waggoner Entities would be jointly and severally liable for YCC's withdrawal liability.

Nevertheless, Defendants argue additional factual inquiry into "whether an employer is striving to circumvent withdrawal liability" is required. Defendants' Response at numbered pg. 15

(ECF No. 58). Defendants' cite the District of New Jersey's holding in *Demza* as support for their contention. *Id. Demza* is, however, inapposite. In *Demza*, the undisputed facts demonstrated the companies were *not* "linked by a parent" or subject to a common owner. *N.J. Bldg. Laborers' Statewide Benefit Funds v. Demza Masonry LLC*, No. 18-cv-9607, 2019 U.S. Dist. LEXIS 207592 at \*19 (D. N.J. Dec. 3, 2019). The court held common control could nevertheless still be found if the employer was "striving to circumvent withdrawal liability by fractionalizing their operations." *Id.* at \*20 (internal citation omitted). Based on the factual record in *Demza*, the court held this inquiry was better suited for determination at trial. *Id.*

Here, the Court need not inquire whether Defendants were "striving to circumvent withdrawal liability by fractionalizing their operations" since the undisputed facts already establish common control. Unlike *Demza*, the undisputed facts here demonstrate the Waggoner Entities *are* subject to a sole, common owner: Mr. Waggoner. Accordingly, the Court finds the Waggoner Entities are under common control within the meaning of ERISA and the MPPAA.

## V.   CONCLUSION

The Court finds Defendant YCC had notice of York's withdrawal liability prior to signing the only valid contract concerning the asset sale: The July 3, 2018 Written Asset Purchase Agreement. However, determining whether YCC substantially continued York's operations is subject to multiple reasonable factual interpretations and would require the Court to weigh facts such that the issue is better suited for determination at trial. Lastly, the undisputed facts establish that the Waggoner Entities, including YCC, are businesses under common control and therefore jointly and severally liable for any withdrawal liability incurred by YCC.

Consistent with these determinations, the Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 55) and Plaintiffs' Motion for Summary Judgment (ECF No. 56) is **GRANTED IN PART** and **DENIED IN PART**.  An appropriate Order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge
