IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND, *et al.*, <br>  Plaintiffs, <br> <br> v. <br> <br> BYRON WAGGONER, *et al.*, <br>  Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Civil No. 5:20-cv-05560-JMG |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                           May 10, 2024

      Pension Fund Plaintiffs bring this case to recover Employee Retirement Income Security Act (ERISA) withdrawal liability damages from Defendants on a theory of successor liability. Presently before the Court is Plaintiffs' second motion for summary judgment. ECF No. 119. In the first round of motions for summary judgment, both parties applied a two-element test for successor liability. This additional round of motion practice stems from Defendants' late claim that a third element exists. Namely, Defendants now argue that Plaintiffs must also prove the predecessor entity cannot provide adequate relief before the successor may be reached. *See generally* ECF No. 120 at 1-2. Defendants are estopped from bringing this entirely new argument after failing to raise it, and even arguing to the contrary, throughout the course of litigation. Moreover, on the substance, Defendants' argument misstates the law and, in any case, is unsupported by the facts of the case. For these reasons, the Court grants Plaintiffs' motion.

I.  BACKGROUND[1]

   A.  **Procedural Background**

The procedural background of this case begins with Plaintiffs' prior lawsuit against the predecessor entity, the York Concrete Company (currently known as YCC Holdings Company), seeking recovery of pension withdrawal liability not satisfied by that entity as required under ERISA and the Multiemployer Pension Plan Amendments Act (MPPAA). *Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company*, Case No. 19-266. On July 22, 2019, the Court entered default judgment in favor of the Fund and against YCC Holdings Company in the amount of $278,978.90. *Id.* at ECF No. 11.

Plaintiffs then filed this case on November 6, 2020, seeking satisfaction of the judgment from the successor entities, alleged to be Defendants YCC, LLC, Byron Waggoner, and the Waggoner entities. On December 15, 2022, the Court resolved the parties' cross-motions for summary judgment by ruling Defendants had notice of predecessor entity's withdrawal liability prior to purchasing the company's assets, but reserving the issue of substantial continuation of the predecessor's operations for determination at trial. ECF No. 65. Lastly, the Court determined Defendants are businesses under common control and therefore jointly liable for any withdrawal liability should substantial continuity be established at trial. *Id.* In sum, as to successor liability, the Court's Order on Summary Judgment left a single issue for resolution at trial – whether there was a substantial continuation of the predecessor's operations by Defendants.[2]

On October 31, 2023, the Court held the final pretrial conference. Later that same day,

---

[1] A more fulsome recitation of procedural and factual background is found in the Court's ruling on the original Motion for Summary Judgment. ECF No. 65.
[2] Also left for determination at trial, should Plaintiffs establish successor liability, was whether YCC, LLC is the alter ego of Byron Waggoner such that the corporate veil should be pierced.

Defendants filed their Proposed Findings of Fact and Conclusions of Law. ECF No. 99. Here, Defendants argued, for the first time, the existence of another element for successor liability that must be established at trial, that is "the predecessor was unable to provide adequate relief." *Id.*

On November 6, 2023, there was a one-day bench trial. *See* ECF No. 101. Following the bench trial, the Court directed briefing from the parties regarding the newly raised and disputed third element for successor liability. *See* ECF Nos. 104 and 105. On November 27, 2023, at request of Plaintiffs, the Court reopened limited discovery on this issue. ECF No. 108. On February 29, 2024, the Court ordered additional briefing "on the application of information acquired from reopened discovery." ECF No. 118. Plaintiffs then filed the current motion for summary judgment, Defendants responded (ECF No. 120), and Plaintiffs filed a reply brief. ECF No. 123.

**B.     Factual Background[3]**

The York Concrete Company was established in 1929 and, thereafter, operated as a concrete manufacturer in York, Pennsylvania. *See* Stat. Facts ¶¶ 1, 3. Fredrick Miller ("Fred Miller") began working for the Company in 1963, and he took ownership in 1977 and became President of the Company. *See* Stat. Facts ¶¶ 5-7. The York Concrete Company continued to operate and serve customers around the York, Pennsylvania area for the next four decades, but the Company began to struggle financially before selling its assets to Defendant Waggoner. *See* Stat. Facts ¶ 9.

In 2017, Waggoner began making payments towards his purchase of the York Concrete Company's assets. *See* Stat. Facts ¶ 17. However, it was not until July 3, 2018, that the sale of

---

[3] The following facts are undisputed or taken in the light most favorable to Defendants, the nonmovants. Unless otherwise noted, "Stat. Facts" refers to Plaintiffs' Statement of Undisputed Material Facts, ECF No. 119-3, and the corresponding paragraphs in Defendants' Response to Plaintiffs' Statement of Facts, ECF No. 120, which are identically numbered.

these assets to YCC, LLC (an entity solely owned by Defendant Waggoner) was memorialized by way of an Asset Purchase Agreement. *See* Stat. Facts ¶ 18. After the sale of its assets, the York Concrete Company was formally renamed "YCC Holdings Company."[4] *See* Stat. Facts ¶ 48. Waggoner's purchase of "all of the assets of the York Concrete Company" took place in two bites. Bench Trial Tr., Nov. 6, 2023, at 65, ECF 102. First, pursuant to the Asset Purchase Agreement, YCC, LLC purchased the non–real estate assets of the York Concrete Company for a total of $400,000. *See* Stat. Facts ¶ 19. Also, by separate agreement, the York Concrete Company sold all its real estate assets to Girard Avenue Holdings, another entity fully controlled by Waggoner, for $200,000. *See* Stat. Facts ¶¶ 29-33. The funds went towards paying back Fred Miller for lending approximately $790,000 to the York Concrete Company. *See* Stat. Facts ¶¶ 12-14, 37. In total, the value of the payments received for the assets and real estate amounted to $600,000, which was still not enough to repay what Miller had lent to the Company. *See* Stat. Facts ¶¶ 12, 38-39.

On May 1, 2018, the Central Teamsters of Pennsylvania Fund ("the Fund") notified the YCC Holdings Company that the sale of the company assets had triggered an assessment of "withdrawal liability" in the amount of $193,363.00 (the "Withdrawal Liability"). *See* Stat. Facts ¶ 74. On January 18, 2019, the Fund and its Trustees filed a lawsuit against YCC Holdings Company in the United States District Court for the Eastern District of Pennsylvania seeking the Withdrawal Liability, interest, liquidated damages, and attorneys' fees and costs. *See* Stat. Facts ¶ 75. On July 22, 2019, the Court entered default judgment in favor of the Fund and against YCC Holdings Company in the amount of $278,978.90. *See* Stat. Facts ¶ 76.

Currently, YCC Holdings Company is not a functioning business. *See* Stat. Facts ¶ 50. It

---

[4] The assets purchased by Waggoner included the trade name "York Concrete Company." Asset Purchase Agreement at 9, Ex. G to Pls.' Mot., ECF No. 119-5.

has no active working employees. *See* Stat. Facts ¶ 56. It has no means to produce concrete. *See* Stat. Facts ¶¶ 51, 55. Fred Miller had loaned about $790,000 to the company to keep it operational, but he personally kept the proceeds from the sale of the assets in what he viewed as partial repayment of this loan. *See* Stat. Facts ¶¶ 12-14, 37. The Company was left with insufficient assets to pay the Judgment owed to Plaintiffs. *See* Stat. Facts ¶¶ 46, 51.

## II.  STANDARD

### Summary Judgment

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify [] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181,

192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

### III.     ANALYSIS

#### A.     Defendants are Estopped from Raising Existence of Third Element

Throughout the entire course of this litigation, the Court and the parties have proceeded with the understanding that Plaintiff must establish two elements, notice and continuity of operations, before Defendants can be held liable here on a theory of successor liability. It was not until the evening following the final pretrial conference that Defendants made a first, vague mention of a third element of successor liability, namely the inability of the predecessor entity to provide adequate relief. Before considering the legal and factual shortcomings of this new argument, the Court finds Defendants are estopped from raising it after years of affirmatively acknowledging the existence of only two elements.

On January 4, 2021, in its Answer to the Complaint, Defendants made no reference to a third factor, and attacked the Plaintiffs' theory of liability on only notice and continuity of operations. ECF No. 7 at 2-4.

On February 2, 2021, in the Joint Report of Rule 26(f) Conference, Defendants summarized their defense and again challenged only notice and continuity of operations. ECF No. 11 at 2-3. Likewise, at the Rule 16 conference on February 9, 2021, Defendants raised only the elements of notice and continuity of operations.

On January 27, 2022, in its Answer to the Amended Complaint, Defendants still made no reference to a third factor, and attacked the Plaintiffs' theory of liability on only notice and continuity of operations. ECF No. 33 at 2-10.

Also on January 27, 2022, in their Motion to Dismiss the Amended Complaint, Defendants made no reference to a third factor. *See generally* ECF No. 34. Likewise, on February 28, 2022, in

their Reply in Response to Plaintiff's Opposition to Motion to Dismiss, Defendants made no reference to a third factor. *See generally* ECF No. 37-1.

On October 3, 2022, Defendants filed a Motion for Summary Judgment. ECF No. 55. Defendants argued the controlling case in the Third Circuit is *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 99 (3d Cir. 2011). ECF No. 55-1, at 14-15. Defendants affirmatively acknowledged, "an asset-purchase successor may be liable for a seller's delinquent ERISA withdrawal liability 'where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and seller.' <u>Thus, two elements exist: notice and continuity of operations</u>." *Id.* (citing *Einhorn*, 632 F.3d at 99 (emphasis added)).

On October 17, 2022, in their Response in Opposition to Plaintiff's Motion for Summary Judgment, Defendants again acknowledged "the *Einhorn* elements require notice <u>and</u> substantial continuity of business." ECF No. 58 at 11 (emphasis in original). Defendants made no reference to a third factor.

On December 15, 2022, the Court ruled on the parties' dueling motions for summary judgment and did so based on the two-element test established by *Einhorn* and acknowledged by all parties in their briefing. ECF No. 65.

On August 9, 2023, Defendants filed their Pretrial Memorandum, yet again acknowledging "the Third Circuit has imposed a two-element test upon district courts when analyzing successorship liability for successors from predecessor ERISA withdrawal liability: notice and substantial continuity of business." ECF No. 86 at 2. The Court and opposing parties relied on Defendants' unwavering acknowledgement of a two-element test, particularly when reiterated at the late stage of pretrial memorandums.

In every case scheduled for trial, as a minimum requirement, counsel must file a

7

>pre-trial memorandum that sets forth a factual summary of the case, the parties' respective claims and defenses, the relief sought, and a list of witnesses and exhibits to be used or introduced into evidence. Failure to do so can result in the imposition of sanctions, including the preclusion of witnesses or evidence.

L. Civ. R. 16.1(f)(1).

On October 31, 2023, the Court held a final pretrial conference, with the bench trial scheduled to commence six days later. Throughout the lengthy conference, the parties and the Court confirmed that Plaintiffs' case required establishing only notice and continuity of operations.

Then, also on October 31, 2023, just hours after the completion of the Final Pretrial Conference, Defendants slipped a first, vague contention of a purported third element into their Proposed Findings of Fact and Conclusions of Law. ECF No. 99 at 9. This filing included, for the very first time, the argument that *Einhorn* required a third element, namely that "the predecessor was unable to provide adequate relief." *Id.* Defendants offered no further explanation for their last-minute change of heart, and the Court can conceive of none other than the nearness of trial.[5]

Framing the issue here as a two-part analysis for nearly three years of litigation, only to pull the rug out from under the Court and opposing parties mere days before trial is more than bad form. It greatly prejudices Plaintiffs who have conducted discovery and developed their case in reliance on Defendants' affirmative representations of the parameters of the dispute. It also disrupts the Court's calendar. By sitting on their argument until far beyond the 11th hour, Defendants are now estopped from raising it.

### B.     There is No Third Element for ERISA Successor Liability

In the spirit of belt and suspenders, the Court shall consider Defendants' substantive

---

[5] For a fuller discussion of the circumstances of Defendants' late pronouncement of a third element, see the transcript of the civil bench trial. ECF No. 109 at 5-13.

argument that a third element must be established to impose successor liability upon them. Here, Defendants are wrong on the law.

The Court agrees with the parties that the controlling case here is *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 99 (3d Cir. 2011). But the parties now differ on whether *Einhorn* requires a two-element or three-element test for Defendants to be held liable as the successor entity for the ERISA withdrawal liability. Fortunately, the text of *Einhorn* is clear on the subject.

> In sum, we hold that a purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and seller.

*Einhorn*, 632 F.3d at 99. The plain language of *Einhorn* supports Plaintiffs' contention we are working with a two-element test – notice and continuity of operations. Defendants accept the existence of these two elements, but now also contend that a later Third Circuit case, *Thompson v Real Estate Mortg. Network*, "interrupted" the *Einhorn* Court's intention that Plaintiffs' must also establish a third element here – the inability of the predecessor entity to satisfy the obligation. *See* ECF No. 104 at 1, (citing *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 145 (3d Cir. 2014)). The Court disagrees.

It takes more than a rose-colored lens to find a third element for ERISA successor liability in *Thompson*. At the outset, rather than an ERISA action, *Thompson* involved a claim for unpaid overtime brought under the Fair Labor Standards Act. In each statutory context, the Court noted the easing access to successor liability, pursuant to the particular remedial aims of Congress. But nowhere did it say these aims or the elements were identical to achieve successor liability under each statute. The Third Circuit explained:

> Thompson urges that, as to her FLSA claim, we apply a federal common law standard for successor liability that has slowly gained traction in the field of labor

9

  and employment disputes over the course of almost fifty years. That standard, which presents a lower bar to relief than most state jurisprudence, was designed to "impos[e] liability upon successors beyond the confines of the common law rule when necessary to protect important employment-related policies[,]" *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 94 (3d Cir.2011), and dictates consideration of only the following factors: "(1) continuity in operations and work force of the successor and predecessor employers; (2) notice to the successor-employer of its predecessor's legal obligation; and (3) ability of the predecessor to provide adequate relief directly." *Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 178 (3d Cir. 2004) (quoting *Rego v. ARC Water Treatment Co. of Pa.*, 181 F.3d 396, 402 (3d Cir. 1999)).

*Thompson,* 748 F.3d at 150-51.

  In this passage, the Court discusses the trending access to successor liability for employees in labor disputes with their employers, citing *Einhorn* as making the same general point. It then turns to the three-element test used in the *Brzozowski* and *Rego* cases, in consideration of whether successor liability is appropriate in the context of Plaintiff Thompson's own FLSA dispute and, if so, which elements must be proven. We strain in vain to see the "interpretation" in *Thompson* so apparent to Defendants that "*Einhorn* supports the three-element approach." Defs' Letter Br. 1-2 November 7, 2023, ECF No. 104. We also see no need for "interpretation" of *Einhorn*'s clear imposition of a two-element test for successor liability in the ERISA context. Where *Einhorn* is cited in *Thompson*, it is to reinforce that a "lower bar to relief" applies in the ERISA context given the remedial policy aims of ERISA and MPPAA. *Thompson*, 748 F.3d at 150.

  *Brzozowski* and *Rego* are also referenced in *Thompson*, but each is quickly and easily distinguishable from *Einhorn* as the former cases involved employment discrimination under Title VII, and not ERISA as was the case in *Einhorn* and the case presently before this Court. *Einhorn* discusses these same cases but, again, only to note the more general extension of successor liability into the arena of employment discrimination. *Einhorn*, 632 F.3d at 95.

  As to the issue at hand, the *Einhorn* Court unambiguously adopted a two-part inquiry for

10

establishing successor liability in the context of ERISA pension fund contributions. In doing so, the Court concurred with the rationale of *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990), which had endorsed the two-element test under similar circumstances. *See Einhorn*, 632 F.3d at 96.

"*Artistic Furniture* held that a successor purchaser of assets may be liable for the seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there was sufficient evidence of 'continuity of operations' between the entities." *Id.* at 93 (citing *Artistic Furniture*, 920 F.2d at 1327-29). Said otherwise, given the important policy goal of protecting ERISA pension funds, the formula used by the Court in *Artistic Furniture* was: notice + continuity = successor liability. So obvious was the reasoning (and the math), the *Einhorn* Court stated, "In light of the Seventh Circuit's comprehensive analysis, we need not reinvent the wheel." *Id.* at 96.

The Third Circuit was indeed mindful of these policy goals when it decided *Einhorn*. "We have recognized that because ERISA and the MPPAA are remedial statutes, they 'should be liberally construed in favor of protecting the participants in employee benefit plans.'" *Id.* at 98 (quoting *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir.1986)). Writing a third element into *Einhorn* would lessen the remedial impact found appropriate by that Court.

Defendants offer one lonely case from this Circuit in ostensible support of their argument that Plaintiffs must establish the inability of the predecessor entity to provide adequate relief before reaching successors. *Shopman's Local Union 502 Pension Fund v. Samuel Grossi & Sons, Inc.*, 578 F. Supp. 3d 698 (E.D. Pa. 2022). *See* ECF No. 104 at 3. In *Shopman's Local*, a like-case of ERISA successor liability, the United States Magistrate Court noted, without comment, the parties

11

agreed to the presence of a three-factor test in their case. *Shopman's Local* 578 F. Supp. at 710-11. There is no further discussion of this agreement, and the Court then addressed the only issue raised in the motion, that being whether the continuity of operations element required a formal merger between the predecessor and successor entities (for score-keeping purposes, the Court found no such requirement). *Id.* at 711. As such, there was no meaningful analysis of the purported third factor from which to join Defendants in their leap to add a third element to the plain language of *Einhorn*.

        **C.**     **No Genuine Dispute of Material Fact that Predecessor Entity is Unable to Provide Adequate Relief**

Even if the law imposed a third element to establish successor liability, Defendants would still fall short on the undisputed material facts in the record of this case.

As discussed, Defendants sought to introduce a "new" element in the final days of this years-long litigation. The Court took under advisement the propriety and legal correctness of this request, permitting additional discovery and briefing on the issue. Plaintiffs then filed this Motion for Summary Judgment on the Contested Third Element of Successor Liability.

In its Opposition, Defendants muddy the identity of the predecessor entity in this case. *See generally* ECF No. 120. At various times, Defendants refer to the Predecessor Entity as "Fred Miller's prior company—the predecessor at issue," *Id.* at 1, "Fred Miller, whose company the Fund has a default judgment against Miller," *Id.* at 2, "the predecessor entity and Fred and Lois Miller," *Id.* at 6, "Predecessor Entity AKA Fred and Lois Miller," *Id.* at 7, "the predecessor—York Concrete Company (owned by Fred Miller)" *Id.*, and "Fred Miller as the Predecessor." *Id.* at 9.

To be sure, the predecessor entity here is The York Concrete Company, a/k/a YCC Holdings Company. This is the entity determined to have been responsible for the delinquent

payments to the pension fund. *Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company*, Case No. 19-266, at ECF No. 1 and 11. Defendants have not directly challenged this determination, despite the slipperiness of language in their opposition. Indeed, from the start to end of this litigation, the Court and the parties have proceeded under this assumption. *See generally, e.g.*, Compl., ECF No. 1; Am. Compl., ECF No. 23; Ct's Mem. Op. on Original Mot. for Summ. J., ECF No. 65.

Having clarified who is the predecessor entity, we next examine whether Plaintiffs have established this entity is unable to provide adequate relief to warrant holding Defendants liable as the successor entity. This would seem simple enough. But Defendants add yet another layer to their newly-raised claim of a third element. They contend, "it is far from a settled issue" the point at which the predecessor must have lacked the ability to satisfy the obligation. ECF No. 120-2 at 14. In other words, must Plaintiffs show the predecessor is presently unable to pay, or that it was unable to pay at some earlier, unspecified time? Defendants advocate for the latter. The Court is unpersuaded.

In *Thompson*, when analyzing the third element in the context of that FLSA case, the Court was satisfied that the third element is established upon proof the predecessor is currently unable to pay its debt. "As to the third factor, the predecessor's 'ability ... to provide adequate relief directly,' defendants have represented that [predecessor] is now 'defunct,' which we take to mean that it is likely incapable of satisfying any award of damages to Thompson." *Thompson*, 748 F.3d at 153.

Common sense also supports the notion that the ERISA obligation travels with the entity, rather than with the prior shareholders of the entity. This is consistent with the *Einhorn* Court's liberal application of these remedial statutes in the interest of protecting pension funds. Not consistent would be the ability of successors to avoid the pension obligation by requiring the

13

protected Fund to establish the predecessors cannot afford to pay the obligation. Or, worse yet, requiring the Fund to prove the predecessor could not have afforded to pay off the obligation when the Fund originally called in the debt. Therefore, "the Court concludes that the relevant time is the filing of the motion seeking a determination as to successor liability. Here, choosing the earlier date would essentially leave Plaintiff without a remedy and defeat the purposes of [ERISA]. On the other hand, choosing the later date will provide Plaintiff with a potential remedy and uphold the purposes of [ERISA], and [Successor] may seek indemnification from [Predecessor] for any damages that it may suffer." *E.E.O.C. v. Nichols Gas & Oil, Inc.*, 688 F. Supp. 2d 193, 203 (W.D.N.Y. 2010).

Speaking of indemnification, Plaintiffs correctly note that Defendants included an indemnity provision in their purchase of the assets of the predecessor. *See* Stat. Facts ¶ 73. Despite the ability to do so, Defendant Waggoner acknowledged he did not seek relief from the predecessors because "they don't got no money." Byron Waggoner Dep. Tr. Excerpt at 48:15-22, Ex. L to Pls' Mot., ECF No. 119-5. The facts in the record support this conclusion.

There is no genuine dispute that YCC Holdings Company is in no shape to satisfy the liability here. It may remain registered as an active company, but that is in name only. *See* Stat. Facts ¶ 50. It does not possess any employees, active management, or a viable business model. *See* Stat. Facts ¶¶ 50, 54-56. In the sense that it is a concrete company, it is not able to produce any concrete. *Id.* Also, it has not filed taxes since its assets were obtained by Waggoner. *See* Stat. Facts ¶ 57. These factors are all indicative of a company that is not functioning and cannot satisfy any liability against it. Or, as Fred Miller tells it, the valuation of YCC Holdings Company is "zero right now." Miller Dep. Tr. at 104:17-19, Ex. B to Pls.' Mot., ECF No. 119-5. For these reasons, at present, YCC Holdings Company cannot pay the liability, which would allow Plaintiffs to

14

satisfy the argued-for third element.

Even though the proper standard for the third element is whether the predecessor has the current ability to pay the liability, YCC Holdings Company's ability to pay in the past was not any better. At the time of sale of its assets, YCC Holdings Company (then York Concrete Company) was in no position to satisfy the liabilities. As evidenced by the York Concrete Company's past tax returns, the company was struggling for years before the sale of assets to Waggoner. *See* Stat. Facts ¶ 9. This is consistent with the uncontroverted evidence that Fred Miller had to make loans to the company to keep it afloat. In total, Fred Miller loaned the company about $790,000. *See* Stat. Facts ¶¶ 12-14, 37. As noted, Defendant Waggoner has conceded he never sought indemnification from the Millers, despite the indemnification clause, because there was no money to be had. Perhaps feeling the weight of this admission, Defendants <u>now</u> argue the predecessor <u>could</u> have paid the liability to the Fund from the assets received in the sale. *See* ECF No. 120-2 at 8.

As such, Defendants argue this Court should "deny the Fund's motion for summary judgment and require the Fund to seek recovery through Fred Miller, whose company the Fund has a default argument against." *Id.* at 2. Defendants offer no support for their policy-busting suggestion that Plaintiffs must next chase the proceeds of the sale provided by Defendants when it purchased the predecessor's assets. This Court declines Defendants' invitation to read the policy role of protecting pension funds out of ERISA, MPPAA and *Einhorn*, or to replace it with an ever-shifting game of whack-a-mole where successor liability means no more than go get your money from the predecessor yourself.

Defendants' final refuge is the claim that basic "fairness" requires the Court to side with the "innocent purchaser" who unwittingly takes on the debt of the successor. ECF No. 120-2 at 1,

12-13. There are two problems with this fallback argument. First, *Einhorn* accounts for this concern by requiring proof of "notice of the liability prior to the sale." *Einhorn*, 632 F.3d at 99. Then, second, Defendants' prior notice of the obligation has already been established here. *See* ECF No. 65 at 11-17. Such foreknowledge allows a buyer to assess the value of assets and liabilities being obtained when considering the price to put on its purchase. *See Einhorn*, 632 F.3d at 98 (*citing Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 172 n.2 (1973)). This was the case here where, knowing of the liability, Defendants took the opportunity to write the protection of an indemnity clause into the purchase agreement. Because Defendants bought the predecessor's assets while on notice of the obligation owed to Plaintiffs, it is certainly "fair" to pursue potential successor liability against them.

Overall, based on the facts presented, no material dispute exists as to whether the predecessor company has the ability to pay the liability. It does not – neither in the past nor present time. Even if *Einhorn* requires proof of the third element in this ERISA context, the same has been established on the record of this case.

### III.   CONCLUSION

Plaintiffs' instant Motion for Summary judgment is granted because, procedurally, Defendants failed to timely raise the issue of a third element for successor liability, and, substantively, the law and the facts of this case require it. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge