**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| CENTRAL PENNSYLVANIA TEAMSTERS | : |
| PENNSYLVANIA FUND, *et al*., | : |
| Plaintiffs, | : |
| | : |
| v. | :     Civil No. 5:20-cv-05560-JMG |
| | : |
| BYRON WAGGONER, *et al.*, | : |
| Defendants. | : |

CENTRAL PENNSYLVANIA TEAMSTERS :
PENSION FUND, *et al*., :
      Plaintiffs, :
  :
     v. :    Civil No. 5:20-cv-05560-JMG
  :
BYRON WAGGONER, *et al.*, :
      Defendants. :

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **September 13, 2024**

## I.     INTRODUCTION

Plaintiffs, Central Teamsters Pension Fund ("the Fund") and Trustees, strive to recover Employee Retirement Income Security Act ("ERISA") withdrawal liability damages previously assessed against The York Concrete Company based on a theory of successor liability. Plaintiffs claim that all Defendants are liable for these damages as a result of an asset purchase where Defendants bought the totality of The York Concrete Company's assets.  As the Court previously ruled in its second summary judgment opinion, there is a two-element test to impose successor liability which requires a plaintiff to establish sufficient notice and continuity of operations. *See* ECF No. 124 at 1, 9. Based on the following findings of fact and conclusions of law, Plaintiffs have presented sufficient evidence to meet the notice and continuity of operations requirements and to pierce the corporate veil. For the reasons set forth below, judgment is entered in favor of Plaintiffs against all Defendants.

## II.     PROCEDURAL HISTORY

The procedural background of this case starts with a prior lawsuit involving Plaintiffs and The York Concrete Company (now named YCC Holdings Company). Plaintiffs were seeking recovery of pension withdrawal liability not satisfied by that entity as required under ERISA and the Multiemployer Pension Plan Amendments Act ("MPPAA"). *Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company,* Case No. 19-cv-00266. On July 22, 2019, the Court entered default judgment in favor of the Fund and against YCC Holdings Company in the amount of $278,978.90. *Id.* at ECF No. 11.

Plaintiffs began the current case on November 6, 2020, to seek satisfaction of the previous judgment. On December 15, 2022, the Court resolved the parties' cross-motions for summary judgment by ruling Defendants had notice of predecessor entity's withdrawal liability prior to purchasing the company's assets, but the Court reserved the issue of substantial continuation of the predecessor's operations for determination at trial. ECF No. 65. The Court also determined Defendants are businesses under common control and are therefore jointly liable for any withdrawal liability should substantial continuity be established at trial. *Id.* After summary judgment, there remained two issues to be determined at trial: (1) whether there was a substantial continuation of the predecessor's operations by Defendants and (2) whether York Concrete Company, LLC ("YCC") is the alter ego of Byron Waggoner ("Waggoner") such that the corporate veil should be pierced and he should be held personally liable.

On October 31, 2023, the Court held the final pretrial conference. Later that same day, Defendants filed their Proposed Findings of Fact and Conclusions of Law. ECF No. 99. On November 6, 2023, there was a one-day bench trial addressing the remaining two issues. *See* ECF No. 101. After the bench trial, the Court directed briefing from the parties regarding a newly raised

and disputed third element involving successor liability. *See* ECF Nos. 104 and 105. On November 27, 2023, at Plaintiffs' request, the Court reopened limited discovery on this issue. ECF No. 108. On February 29, 2024, the Court ordered additional briefing pertaining to the application of information acquired from the reopened discovery. ECF No. 118. Plaintiffs then filed a second motion for summary judgment, and Defendants responded. ECF Nos. 119 and 120. Plaintiffs also filed a reply brief. ECF No. 123. The Court resolved this motion for summary judgment in favor of Plaintiffs by ruling that there are only two elements necessary to satisfy successor liability in this case. *See* ECF No. 124.

Following the second round of motions of summary judgment, the Court ordered the parties to file their proposed findings of fact and conclusions of law. ECF No. 126. The parties subsequently filed their proposed findings of fact and conclusions of law on June 6, 2024. ECF Nos. 128 and 129. The following findings of fact and conclusions of law are based upon the evidence presented at trial and the parties' submissions.

### III.   FINDINGS OF FACT[1]

#### A.  The York Concrete Company's Withdrawal Liability to Plaintiffs

1.      Plaintiffs, the Fund and its Trustees, serve local unionized employees through pension or health funds. Trial Transcript, November 26, 2023 ("Tr. Trans.") at 28:1-9.

2.      Plaintiffs served unionized employees at The York Concrete Company since approximately the 1970s. *Id.* at 28:18-24.

3.      Through a collective bargaining agreement, The York Concrete Company had to make contributions to Plaintiffs on behalf of its employees. *Id.* at 28:19-24.

---

[1] The Findings of Fact are substantially derived from the parties' Proposed Findings of Fact filed at ECF Nos. 128 and 129.

4.      The York Concrete Company made contributions until 2017. *Id.* at 29:11-13, 17-20; Joint Ex. 1.

5.      In January 2018, The York Concrete Company stopped making contributions to Plaintiffs. Tr. Trans. at 33:2-6.

6.      On February 12, 2018, Plaintiffs sent a letter to The York Concrete Company's President Fred Miller. *Id.* at 34:13-19; Joint Ex. 2.

7.      Plaintiffs sent the February 12, 2018, letter because it learned that The York Concrete Company's business may be sold, and Plaintiffs wanted more information to learn about a potential sale. *Id.* at 33:9-14; 34:20-25.

8.      Mr. Miller called Plaintiffs confused—he could not understand why Plaintiffs asked him questions about his business. *Id.* at 36:9-19.

9.      In response, Plaintiffs sent a second letter to The York Concrete Company on March 23, 2018, to ask more detailed questions about the sale. *Id.* at 36:7-9, 16-22; Joint Ex. 3.

10.     Plaintiffs never received a response to this second letter. *Id.* at 37:1-3.

11.     Plaintiffs sent a third letter on May 1, 2018. *Id.* at 37:16-24; Joint Ex. 4 at Central PA Teamsters 000002.

12.     The third letter demanded withdrawal liability as a result of The York Concrete Company's potential sale of the business. Tr. Trans. at 37:21-25.

13.     Withdrawal liability is an employer's portion of unfunded pension plan liability. *Id.* at 34:1-3.

14.     The York Concrete Company's estimated withdrawal liability as of May 1, 2018, was $193,363. *Id.* at 38:12-15; Joint Ex. 4 at Central PA Teamsters 000002.

15.     Plaintiffs never received a response to this third letter nor any payments toward the withdrawal liability. Tr. Trans. at 39:8-15.

16.     Plaintiffs sued The York Concrete Company and received a default judgment in the amount of $278,978.90 ("the Withdrawal Liability"). *Id.* at 39:20-25; 40:5-6, 19-21; Joint Ex. 5.

17.     The $278,978.90 awarded included the underlying withdrawal liability, interest, liquidated damages, and attorneys' fees. Tr. Trans. at 40:22-41:5.

18.     The Fund took various efforts to recover the Withdrawal Liability against The York Concrete Company, to no avail. *See* Pl.'s Statement of Undisputed Facts in Supp. of Their Mot. for Summ. J. on The Contested Third Element of Successor Liability, ECF No. 119-3, at 15-16.

19.     Indeed, to date, The York Concrete Company has not made any payments toward the Withdrawal Liability. Tr. Trans. at 41:6-8.

20.     Nonetheless, as of November 2023, twenty-six (26) individuals associated with The York Concrete Company were receiving a benefit from the Fund. *Id.* at 30:17-21.

21.     These individuals include retirees and surviving spouses of deceased former employees of The York Concrete Company. *Id.* at 31:4-23.

22.     This number does not include individuals who accrued a benefit under the plan while working for The York Concrete Company but who went to work elsewhere before retiring. *Id.* at 31:4-11.

23.     In addition, this figure does not include former employees of The York Concrete Company who have not yet retired but who will be owed a benefit from the Fund when and if they do retire. *Id.* at 31:24-32:12.

24.     These individuals include Robert McClung and Dennis Shaull. *Id.* at 32:13-18.

25.     When Mr. Shaull retires, he will be entitled to approximately $750 in pension benefits every month from the Fund. *Id.* at 32:22-33:1.

26.     The refusal to pay the Withdrawal Liability impedes the Fund's long-term ability to pay benefits owed to retirees and spouses of deceased retirees, including, but not limited to, the benefits owed to beneficiaries associated with The York Concrete Company. *Id.* at 41:20-42:4.

27.     Refusal to pay the Withdrawal Liability could potentially jeopardize the viability of the entire Fund. *Id.*

**B.  The Waggoner Entities and YCC**

28.     Waggoner owns, operates, and fully controls a series of Pennsylvania-based businesses that offer a variety of construction-related services, (collectively, the "Waggoner Entities"). *Id.* at 47:1-3.

29.     Waggoner has 100% ownership of and control over Waggoner Holdings, LLC, a holding company established for the ownership and development of real estate based in East Berlin, Adams County, Pennsylvania. *Id.* at 47:1-48:10; Joint Ex. 7 at Defendants – 000221-228.

30.     Waggoner has 100% ownership and control over Waggoner Fabrication & Millwright, LLC, an entity for the purpose of steel fabrication. Tr. Trans. at 52:8-22; Joint Ex. 10 at Defendants – 000187-194.

31.     Waggoner has 100% ownership and control over Waggoner Roofing, LLC, an entity for the purpose of roofing construction. Tr. Trans. at 53:4-18; Joint Ex. 11 at Defendants – 000210-220.

32.     Waggoner has 100% ownership and control over Best Mechanical Services, an entity for the purpose of providing mechanical, plumbing, and air conditioning services. Tr. Trans. at 53:25-54:6; Joint Ex. 12 at Defendants – 000165-172.

33.     Waggoner has 100% ownership and control over Crane Werks, LLC, an entity for the purpose of crane services operation. Tr. Trans. at 54:20- 25; Joint Ex. 13 at Defendants – 000173-179.

34.     Waggoner has 100% ownership and control over Waggoner Construction, Inc., an entity that specializes in industrial, agricultural, and concrete construction. Tr. Trans. at 49:14-20.

35.     Waggoner knew Fred and Lois Miller ("the Millers"), owners of The York Concrete Company, his entire life. *Id.* at 133:25-134:1.

36.     Waggoner's family purchased concrete from The York Concrete Company since Waggoner was young. *Id.* at 58:16-22.

37.     In the early-mid 2000s, Waggoner tried to build a concrete plant, but that venture ended because of permitting and township issues. *Id.* at 129:7-9.

### C.  The Events Leading to YCC's Purchase

38.     Waggoner initially became interested in purchasing The York Concrete Company's assets in 2014 or 2015. *Id.* at 131:4-6.

39.     The York Concrete Company was for sale for five years before Waggoner went into the concrete plant in anticipation of an acquisition. *Id.* at 129:10-12.

40.     In 2013, 2014, and 2015, Waggoner Construction bought "minimum concrete" from The York Concrete Company because of their struggle to receive and send orders. *Id.* at 130:23-131:2.

41.     The York Concrete Company was producing very little concrete by 2016. *Id.* at 61:17-24.

42.     Waggoner wanted to purchase The York Concrete Company's assets so he could manufacture concrete for his businesses. *Id.* at 59:12-14.

7

43.     Waggoner believed The York Concrete Company's assets—or any other concrete plant's assets—would specifically help Waggoner Construction because Waggoner Construction performs a lot of work for food plants, feed mills, and quarries on weekends and holidays. *Id.* at 131:19-25.

44.     Waggoner wanted access to a concrete plant that could produce concrete whenever Waggoner Construction needed it such as on nights, off-hours, weekends, holidays, etc. *Id.* at 156:13-18.

45.     In 2014 or 2015, Waggoner walked around The York Concrete Company's plant with two members of his management team and Mr. Miller. *Id.* at 131:7-11, 16-18.

46.     Those management team members advocated against any agreement with The York Concrete Company due to the amount of work they would be required to put into the company. *Id.* at 131:10-12.

47.     The next year, Waggoner continued to explore the purchase of The York Concrete Company's assets. *Id.* at 59:6-8; 129:13-15, 132:2-7.

48.     Waggoner's team continued to advocate against acquiring The York Concrete Company's assets. *Id.* at 132:5-7.

49.     At some time near the end of 2017 but prior to the asset purchase, Waggoner took photos throughout The York Concrete Company's plant during a walkthrough. *Id.*at 134:2-10.

50.     One photo shows old chairs lying around with old clothes of people from decades ago. *Id.* at 136:2-10; Joint Ex. 38 at DF York Concrete – 000068.

51.     One photo shows the old batch system which struggled to make accurate concrete—it was functional, but risky and not consistent. Tr. Trans. at 136:24-137:21; Joint Ex. 38 at DF York Concrete – 000070.

52.     Waggoner never saw anyone actually perform concrete producing work using The York Concrete Company's batching system during the times he went to the plant. Tr. Trans. at 136:13-18.

53.     Neither Waggoner nor anyone else from his team used the restrooms while they were there. *Id.* at 139:8-10.

54.     One photo shows broken and worn out pipes that were supposed to be connected to fill the concrete trucks with water and cement. *Id.* at 139:11-22; Joint Ex. 38 at DF York Concrete – 000064.

55.     Waggoner never saw anyone use the broken pipes that were supposed to fill the cement trucks during the times he went to The York Concrete Company's plant. Tr. Trans. at 139:23-140:1.

56.     Neither Waggoner nor anyone else from his team used the broken pipes that were supposed to fill the cement trucks while he was there. *Id.* at 140:2-5.

57.     Another photo shows other disconnected pipes from years of wear and tear. *Id.* at 140:22-141:3; 141:13-19; Joint Ex. 38 at DF York Concrete – 000063.

58.     Waggoner never saw anyone use theses disconnected pipes during the times he went to the plant. Tr. Trans. at 141:20-23.

59.     One photo shows an accumulation of trash littered in the batch room. *Id.* at 141:24; 142:7-11; Joint Ex. 38 at DF York Concrete – 000061.

60.     Trash was accumulated all over the plant. Tr. Trans. at 142:19-22.

61.     The equipment and the plant's condition posed problems to even get as little as one yard of concrete. *Id.* at 140:19-21.

62.     The Millers went to the plant every day, not to manufacture concrete, but to play cards. *Id.* at 132:18-24.

63.     At times, they avoided answering the phones to hold onto their deck of cards. *Id.* at 132:18-21.

64.     Mr. Miller grew up at the plant, so he went there every day even though he was not producing concrete; he wanted just to be there. *Id.* at 132:22-24.

65.     Given its condition, if YCC did not buy The York Concrete Company's assets, the Millers would have sold it to a junk yard just for the land. *Id.* at 153:20-23.

### D.  The Letter of Intent and Handshake Deal

66.     In July 2016, Waggoner had his attorneys draft a "Letter of Intent" that captured the terms of the potential sale of The York Concrete Company to Waggoner. *Id.* at 59:13-60:11, 60:22-25.

67.     In the Letter of Intent, Waggoner indicated his intent to buy substantially all the assets of The York Concrete Company. *Id.* at 60:13-16.

68.     The Letter of Intent indicates that the only items intended to be excluded from the sale were the seller's cash on hand, accounts receivable, and books and records of the seller that "were not required for continued operations." Joint Ex. 14 at DF York Concrete – 000002; Tr. Trans. at 61:9-13.

69.     Waggoner wanted to purchase everything needed to continue the business that The York Concrete Company had been operating since 1944. *See* Tr. Trans. at 59:15-17, 62:18-20.

70.     The Letter of Intent also evidenced Waggoner's intention to hire all the employees that had been working for The York Concrete Company at the time of the purchase by having them

work for his new company. *See Id.* at 62:21-63:8; Joint Ex. 14 at DF York Concrete – 000004 ("It is Buyer's present intention to hire all current employees of Seller.").

71.     As early as August 2017, Waggoner began making payments to effectuate the purchase through Waggoner Construction, Inc. *See* Joint Ex. 33 at DF York Concrete – 000091-99.

72.     Waggoner and the Millers agreed on a handshake deal for the asset purchase agreement roughly at the end of 2017 or the beginning of 2018. Tr. Trans. at 132:8-20.

73.     By early 2018, Waggoner had access to the 400 Girard Avenue facility and began making improvements to the concrete plant. *See id.* at 133:21-25.

74.     Most of the repairs and upgrades took place from January 2018 through May 2018. *See* Joint Ex. 36 at DF York Concrete – 000031-51.

75.     By May of 2018, the renovations were complete, and Waggoner was producing concrete at the facility. *See* Tr. Trans. at 136:21-23.

76.     Around the same time, in May 2018, the Fund informed Mr. Miller that The York Concrete Company owed the Withdrawal Liability. *See* Joint Ex. 4.

77.     That same month, Mr. Miller told Waggoner about the Withdrawal Liability. *See* Waggoner Sept. 2021 Dep. Tr. at 141:20-142:22; *see also* the Court's December 15, 2022 Mem. Op. on Cross Mots. for Summ. J. ("MSJ"), ECF No. 65, at 5.

78.     In response, Waggoner told Mr. Miller that he had no plans to pay the Withdrawal Liability. Waggoner Sept. 2021 Dep. Tr. at 141:25-142:22.

**E.  YCC's Overhaul of the Assets Prior to the Asset Purchase Agreement**

79.     Waggoner completed the renovations on the plant prior to the memorialization of the written Asset Purchase Agreement. *See* Tr. Trans. at 136:21-23.

80.     YCC took over the plant in January 2018. *Id.* at 142:23-143:1.

81.     Immediately after the handshake deal, YCC stayed closed for four months to remodel and overhaul the place. *Id.* at 74:23-75:1.

82.     YCC did not produce any concrete during this four-month overhaul period. *Id.* at 168:10-13.

83.     YCC worked six days a week to overhaul the plant. *Id.* at 148:12-17.

84.     YCC did not produce any concrete until middle or late May of 2018. *See id.; see also id.* at 136:21-23.

85.     YCC did not just clean off the equipment; instead, it tore out the plant top to bottom. *Id.* at 75:2-7, 142:23-143:6.

86.     YCC put in new concrete gates. *Id.* at 75:12-13.

87.     YCC put in all new metal equipment. *Id.*

88.     YCC put in all new bins and a conveyer belt. *Id.* at 75:16-17.

89.     YCC put new rollers on the conveyor belt because the prior rollers were broken. *Id.* at 75:17-19.

90.     YCC put all new valves in. *Id.* at 142:23-143:3.

91.     YCC bought a new rubber tire loader. *Id.* at 149:2-6.

92.     YCC tore the old batching system apart and implemented a new one. *Id.* at 138:2-17.

93.     YCC implemented a new computer system. *Id.* at 148:5-8.

94.     YCC tore out the bathroom and placed a new one in. *Id.* at 139:8-10.

95. YCC had to replace all new pipes in the plant. *Id.* at 140:4-9.

96. YCC put a brand-new water tank in. *Id.* at 140:10-11.

97. YCC put two new roofs on to fix the leaks. *Id.* at 147:20-22.

98. YCC had to rent an air compressor for two months in order to run the plant. *Id.* at 145:1-2.

99. YCC replaced drums in trucks. *Id.* at 147:18.

100. Later, YCC bought new trucks because the existing trucks were outdated rear-end loaders as opposed to front-end loaders. *Id.* at 150:13-22.

101. The five purchased trucks that eventually worked were repainted from grey to green. *Id.* at 150:13-18.

102. Waggoner chose green and white because all of his businesses use a green and white color scheme. *Id.* at 169:1-9.

### F. Memorialized Asset Purchase Agreement

103. The Asset Purchase was ultimately memorialized through a written agreement dated July 3, 2018. *Id.* at 64:23-65:3, 66:3-6; Joint Ex. 15 at DF York Concrete – 000007.

104. In all, The York Concrete Company's assets were purchased for $650,000. Tr. Trans. at 94:4-7, 75:20-22.

105. In addition, YCC agreed to reimburse the Miller's health insurance for five years. *Id.* at 95:9-15, 20-22.

106. YCC also bought the real estate and plant itself. *Id.* at 67:15-19; Joint Ex. 15 at ¶ 1(h).

107. Waggoner Construction loaned the purchase price money to YCC. Tr. Trans. at 101:1-8.

108.    Waggoner used YCC – an entity fully owned and completely controlled by Waggoner – to enter into the July 3, 2018 Asset Purchase Agreement with The York Concrete Company (the "Asset Purchase Agreement"), which memorialized the acquisition of the non–real estate assets of The York Concrete Company. *See id.* at 65:15-66:6; Joint Ex. 15 at DF York Concrete – 000007-24; *see also* MSJ, ECF No. 65, at 5.

109.    The agreement states that YCC bought the inventory, equipment, and intangible assets of The York Concrete Company. Tr. Trans. at 68:15-69:6; Joint Ex. 15 at ¶ 1(a).

110.    The agreement also states that YCC would acquire all of The York Concrete Company's records and good will. Tr. Trans. at 70:9-19; Joint Ex. 15 at ¶ 1(e).

111.    After the Asset Purchase Agreement was executed, Waggoner continued to make payments for The York Concrete Company's assets through Waggoner Construction, Inc. *See* Joint Ex. 33.

### G.  YCC's Substantial Continuation Operations

#### 1.  Continuity of Workforce

112.    Waggoner brought all of the remaining The York Concrete Company employees with him to work for YCC. Tr. Trans. at 63:3-8; 78:23-79:14.

113.    The Asset Purchase Agreement contained an explicit provision that Waggoner "may offer employment to all of [The York Concrete Company's] employees[.]" Joint Ex. 15 at DF York Concrete – 000014.

114.    Mr. McClung was kept on as a "batch man." Tr. Trans. at 79:1-3.

115.    Mr. McClung worked less than one year and is no longer with Waggoner Construction or YCC. *Id.* at 79:1-14.

116.    Today, YCC has 30 of its own employees. *Id.* at 80:7-10, 83:3-4, 130:15-17.

117.    Mr. Shaull, who had worked as a "truck driver/mechanic" for over twenty years at the 400 Girard Avenue facility, was also kept on. *Id.* at 80:1-3; 87:25-88:18; Joint Ex. 45 at DF York Concrete – 000109-124.

118.    Waggoner hired Mr. Shaull into the same position that he held while working for The York Concrete Company. Joint Ex. 45 at DF York Concrete – 000117-18 (reflecting that, on Mr. Shaull's application for employment with Waggoner Construction, Inc., he wrote, "truck driver/mechanic" under "employment desired" and also listed "truck dr/mechanic" as the position he had held at The York Concrete Company since 1996); Tr. Trans. at 85:22-86:5.

119.    Waggoner confirmed that Mr. Shaull's role and duties did not change when he began working for YCC. Tr. Trans. at 87:1-5.

120.    Both as an employee of The York Concrete Company and YCC, Mr. Shaull did most of his work at the 400 Girard Avenue facility manufacturing and delivering concrete. *See* Miller Dep. Tr. 54:16-17, 55:3-7.

121.    Even though he may have performed work initially for other Waggoner Entities, Mr. Shaull spent at least 75% of his time at the 400 Girard Avenue facility. *Id.* at 87:10-13, 88:15-17; Waggoner Sept. 2021 Dep. Tr. at 80:20-81:4; *see also* MSJ, ECF No. 65, at 8.

**2.   Continuity of Management**

122.    The York Concrete Company did not have active managers at the time of the asset sale. *See* MSJ, ECF No. 65, at 19.

123.    YCC did not have a formal management team installed at the site following the sale. Tr. Trans. at 90:19-21

124.    YCC did not inherit or hire any managers from The York Concrete Company. *Id.* at 149:15-21.

125.    Also, YCC did retain the cooperation and services of The York Concrete Company's owners through covenants in the Asset Purchase Agreement, as well as through regular payments made to Mr. Miller for five years following the asset purchase. *See id.* at 95:6-8, *see also* Joint Ex. 15 at DF York Concrete – 000013.

126.    From July 2018 to May 2023, Mr. Miller received regular payments from Waggoner and the Waggoner Entities. *See* Joint Ex. 20 at ComputerEase 000022-41.

127.    The payments lasted for nearly five years. *See* Tr. Trans at 112:13-16.

128.    Mr. Miller received the payments every month from approximately April to November during those five years. *Id.*; *see also* Joint Ex. 20.

129.    The value of each monthly payment was initially $5,552.65. Tr. Trans. at 112:17-19; Joint Ex. 20.

130.    At some point in 2020, the value of the monthly payments increased. Tr. Trans. at 112:20-22; Olivia Waggoner May 2023 Dep. Tr. at 38:20-22.

131.    The payments from Waggoner and Waggoner Entities to Mr. Miller continued until May 2023, right before the trial. *See* Tr. Trans. at 112:23-24; Olivia Waggoner May 2023 Dep. Tr. at 37:19-20.

132.    During this same period, Waggoner and Waggoner Entities also paid the health insurance premium for the Millers. Tr. Trans. at 95:20-22; Joint Ex. 21 at ComputerEase 001946-49.

133.    According to the CFO, it was atypical for YCC to pay for the Millers' health insurance premiums, as the Waggoner Entities did not usually pay health benefits for non-employees. *See* Tr. Trans. at 113:9-12.

134.    After the sale of The York Concrete Company was complete, Mr. Miller continued to provide Waggoner guidance on running the business, including advice on how to make YCC more profitable. *See* Miller Dep. Tr. at 50:13-16.

135.    This advice included encouraging Waggoner to sell concrete to The York Concrete Company's former customers. *See id.* at 50:7-12.

### 3.    Continuity of Equipment and Location

136.    YCC operates from the same commercial property where The York Concrete Company operated: 400 Girard Avenue, York, PA 17403. Tr. Trans. at 56:19-24, 110:23-25, 112:3-5.

137.    YCC did not have any equipment, vehicles or other physical assets before acquiring the assets of The York Concrete Company. *See id.* at 92:5-10; Waggoner Sept. 2021 Dep. Tr. at 73:9-13.

138.    The only physical assets that YCC had when it began operating in 2018 were those that it acquired from The York Concrete Company. *See* Tr. Trans. at 92:5-10.

139.    Waggoner purchased every asset The York Concrete Company had including everything it used to manufacture and deliver concrete. *See id.* at 59:12-17, 68:7-22, 69:7-8, 76:21-24; Joint Ex. 15 at DF York Concrete – 000007.

140.    YCC purchased all the inventory, equipment, and intangible assets of The York Concrete Company. *See* Tr. Trans. at 68:23- 70:15; Joint Ex. 15 at DF York.

141.    This included all of the machinery and vehicles owned by The York Concrete Company, with the exception of the former owners' personal vehicles. *See* Tr. Trans. at 69:7-13; Joint Ex. 15; *see also* MSJ, ECF No. 65, at 7.

142.     Waggoner paid over a half million dollars for the assets and real estate of The York Concrete Company. *See* Tr. Trans. at 75:20-22; Joint Ex. 15 at DF York Concrete – 000008; Joint Ex. 46 at DF York Concrete 000125-164.

143.     Waggoner personally inspected and was aware of the condition of the property when he purchased it from The York Concrete Company. *See* Tr. Trans. at 69:16-17, 93:6-23, 131:13-15, 159:16-160:9.

144.     He also attested that he was "satisfied" with the condition of the equipment and that all inventory was "in good and usable condition." *See* Joint Ex. 15 at DF York Concrete – 000010.

145.     Although Waggoner chose to make improvements, the plant was functional and capable of producing concrete at the time of purchase. *See* Tr. Trans. at 137:15-17, 140:19-21, 153:13-16, 167:19-168:7; *see also* Miller Dep. Tr. at 52:3-7.

146.     Before renovations, The York Concrete Company's concrete bins would only take 10 yards of concrete because the sand and stone were mixed together. Tr. Trans. at 129:23-24.

147.     The York Concrete Company produced at most 10 yards of concrete per day. *Id.* at 153:8-16.

148.     A worker could not get an accurate yard of concrete with the correct mixes of sand, cement, and stone. *Id.* at 148:9-11.

149.     The York Concrete Company's equipment only produced inconsistent concrete. *Id.* at 167:22-168:1.

150.     Only three of the 13 purchased trucks had wheels and ran. *Id.* at 69:11-13, 129:20.

151.     For equipment that was functional, it took a lot of rigging to make it work. *Id.* at 167:19-21.

152. Although Waggoner purchased all the inventory, the full inventory amounted to two loads of sand an about half a load of cement. *Id.* at 69:3-6.

153. YCC still uses the equipment that it acquired from The York Concrete Company to manufacture concrete. *See* Waggoner Sept. 2021 Dep. Tr. at 76:7-12.

154. Today, none of The York Concrete Company's original trucks remain. Tr. Trans. at 150:20-22.

155. With YCC's complete renovation, the company can now load 80 yards of concrete as opposed to about only 10 yards which was possible before the sale. *Id.* at 147:9-16.

156. Although Waggoner claims he made extensive repairs and upgrades to the facility, only a handful of the invoices introduced at trial actually reflect "repairs" to the YCC facility. *See* Joint Ex. 36; Joint Ex. 37 at DF York Concrete – 000052-56; Tr. Trans. at 144:12-147:7.

### 4. Completion of Work Orders Begun by Predecessor

157. Waggoner was not aware of any pending work orders from The York Concrete Company at the time of the sale that were completed by YCC. *See* Tr. Trans. at 150:8-12.

158. After the sale, contractors who owed The York Concrete Company funds would sometimes make payment out to YCC and then Waggoner would forward those funds to Mr. Miller. *See* Miller Dep. Tr. 87:24-88:9.

### 5. Constancy of Customers

159. Under the Asset Purchase Agreement, YCC purchased intangible assets from The York Concrete Company, including customer lists, customer billing, payment records, and "all other customer records and information." *See* Joint Ex. 15 at DF York Concrete – 000008; Tr. Trans. at 70:6-19.

160.    YCC required The York Concrete Company to represent and warrant that "no customer has indicated that it will refuse to do business with [YCC] after the Closing," apparently because YCC planned to – and, in fact, did – continue to do business with The York Concrete Company's former customers. *See* Joint Ex.15 at DF York Concrete – 000010.

161.    The Asset Purchase Agreement also required The York Concrete Company to represent that its customer relationships would not be terminated or adversely modified in any manner before closing and that Mr. Miller would assist with "the transition of customers of the Business" to YCC. *See id.* at DF York Concrete – 000010-13; Tr. Trans. at 76:5-14.

162.    The Asset Purchase Agreement also contained Restrictive Covenants that prohibited Mr. Miller or The York Concrete Company from engaging in any competitive business activity or soliciting any of The York Concrete Company's former customers for five years. *See* Joint Ex. 15 at DF York Concrete – 000014.

163.    YCC continued to do business with four of the five customers previously serviced by The York Concrete Company. *See* Tr. Trans. at 71:24-72:12, 167:18; Waggoner Sept. 2021 Dep. Tr. at 100:22-101:3, 101:9-17, 106:13-17.

164.    Four of The York Concrete Company's former customers bought concrete from YCC. Tr. Trans. at 71:9-14, 72:6-9.

165.    These former customers called YCC to request concrete. *Id.* at 167:3-7.

166.    According to Waggoner, by the time the purchase of The York Concrete Company was finalized in July 2018, YCC had already started servicing The York Concrete Company's former customers. *See id.* at 151:1-5.

167.    YCC's Sales Register, which catalogues the sales made by YCC from May 2018 until September 2021, reflects that YCC serviced multiple former customers of The York Concrete Company. *See* Joint Ex. 43 at DF York Concrete 000100-103; Tr. Trans. at 154:20- 155:16.

168.    The Sales Register does not show any of the sales that YCC supposedly made to Waggoner Construction, Inc. during this period, despite Waggoner's testimony that Waggoner Construction, Inc. was YCC's primary customer and that everything would be properly documented. *See* Joint Ex. 43; Tr. Trans. at 94:16-17, 103:5-7, 156:15-18.

169.    The YCC website states: "We proudly serve York County and the surrounding areas." *See* Tr. Trans. at 96:24-97:1.

### 6.    Additional Considerations Indicating Continuity of Operations

170.    YCC uses The York Concrete Company's former trade name, "York Concrete Company." *Id.* at 73:22-24; Waggoner Sept. 2021 Dep. Tr. at 108:2-6; Joint Ex. 15 at DF – York Concrete 000015; *see also* MSJ, ECF No. 65, at 43.

171.    Waggoner testified that it was important to retain the right to refer to YCC as "York Concrete," "[b]ecause it was called York Concrete before," i.e., recognizing the goodwill associated with the York Concrete Company. *See* Waggoner Sept. 2021 Dep. Tr. at 108:2-6; *see also* Tr. Trans. at 169:10-14.

172.    Signage outside the 400 Girard Avenue property still indicates that the company has been "Pouring Mud Since 1944." *See* Tr. Trans. at 73:25-74:7; Waggoner Sept. 2021 Dep. Tr. at 121:8-16*; see also* MSJ, ECF No. 65, at 6-7.

173.    Waggoner specifically testified that it was valuable to him and his company to continue to advertise YCC as having poured mud since 1944 because The York Concrete Company,

which had been operating at 400 Girard Avenue since 1944, had done "a great job" and built a name for itself in the York area. *See* Tr. Trans. at 74:8-11, 74:12-17.

174.    The Asset Purchase Agreement contained a provision specifically granting YCC the exclusive ability to use The York Concrete Company trade name. *See id.* at 77:3-11; Joint Ex. 15 at DF York Concrete – 000015.

175.    YCC's website represents that the company was "established in 1944" and "is the first and oldest ready mix concrete company." *See* Joint Ex. 16; *see also* MSJ, ECF No. 65, at 7.

176.    YCC marketed itself and capitalized on the value created by The York Concrete Company's name and reputation. *See id.* at 97:14-22.

177.    YCC sent fliers out to businesses to advertise its new services. *Id.* at 130:3-5.

178.    YCC lists The York Concrete Company's goodwill as an asset on its balance sheet and Waggoner reports it on his personal tax filings. *See* Olivia Waggoner May 2023 Dep. Tr. at 19:5-23; Joint Ex. 27; Tr. Trans at 73:7-21.

179.    YCC also uses the same telephone number previously used by The York Concrete Company. Tr. Trans. at 78:17-22; Waggoner Sept. 2021 Dep. Tr. at 101:6-12; *see also* MSJ, ECF No. 65, at 7.

## H.  Piercing the Corporate Veil

180.    YCC is fully owned by Waggoner. *See* Joint Ex. 6; Tr. Trans. at 106:21-23.

181.    YCC, along with all the other Waggoner Entities, is fully controlled by Waggoner. *See* Tr. Trans. at 118:3-10; Olivia Waggoner May 2023 Dep. Tr. at 27:18-21.

182.    Waggoner's control of YCC is not subject to the oversight of a board of directors or a similar entity. *See* Tr. Trans. at 120:3-9, 120:16-18; Olivia Waggoner May 2023 Dep. Tr. at 32:22-33:5, 59:20-60:11.

183.     Waggoner does not need approval from anyone to make monetary contributions or withdrawals from YCC. *See* Tr. Trans. at 118:11-13, 119:6-8; Olivia Waggoner May 2023 Dep. Tr. at 28:23-29:2.

184.     YCC's records are intermingled with those of the other Waggoner Entities. *See* Waggoner Sept. 2021 Dep. Tr. at 72:14-25.

185.     Waggoner initially set up his companies so that they did not have employees, but all workers would be technical employees of Waggoner Construction and would be loaned out to the other various Waggoner Entities. *See* Tr. Trans. at 81:18-82:6, 98:3-9, 107:17-20, 174:25-175:4, 176:2-10.

186.     All the Waggoner Entities have the same official address, in East Berlin, regardless of where they are actually located or operated. *See id.* at 161:18-162:1.

187.     YCC's finances are also intermingled with those of Waggoner and the Waggoner Entities; Waggoner Construction, Inc. operates as a "bank" for the other entities by loaning out employees and cash. *See id.* at 98:11-14; 100:17-101:1; B. Waggoner May 2023 Dep. at 33:8-21.

188.     Waggoner Construction, Inc., not YCC, made the payments for the purchase of The York Concrete Company. *See* Tr. Trans. at 101:2-16; Joint Ex. 33.

189.     Although Waggoner claims that these payments were a "loan" from Waggoner Construction, Inc. to YCC, there is no evidence of a loan agreement or documentation of these loans on the balance sheets. *See* Tr. Trans. at 101:6-8, 102:25-103:20.

190.     Waggoner Construction, Inc., not YCC, paid for the "repairs" to YCC when Waggoner took over the plant. *See* Joint Ex. 36.

191.     All the Waggoner Entities share a singular profit-sharing plan. Tr. Trans. at 98:15-20; Waggoner Sept. 2021 Dep. Tr. at 149:6-18.

192.    Waggoner gained personal tax advantages by claiming depreciation for YCC on his 2017 and 2018 tax returns, even though he did not actually purchase The York Concrete Company's assets until July 2018. *See* Tr. Trans. at 162:9-12, 164:3-8, 164:18-22; Joint Ex. 26 at Waggoner 000264; Joint Ex. 27 at Waggoner 00025-26.

193.    A close family member of Waggoner serves as YCC's Chief Financial Officer ("the CFO") and is responsible for overseeing all financial aspects of the Waggoner Entities, yet she has no professional degree, no financial certification, nor any substantive training. *See* Tr. Trans. at 105:19-21,106:1-12.

194.    According to the CFO, Waggoner is in control of all the finances. *Id.* at 119:11-12.

195.    His compensation is not subject to approval by anyone at the Waggoner Entities besides himself. *See id.* at 119:18-20.

196.    Waggoner is paid through a salary. *Id.* at 120:25-121:19.

197.    Defendants' accountant testified that all the businesses' labor costs, material costs, mark-ups, overhead, profit percentages, and more are tracked in software called ComputerEase. *Id.* at 172:18-173:11.

198.    All payroll is run through ComputerEase where businesses can charge for completion of jobs. *Id.* at 175:11-17.

199.    Defendants' accountant testified that each of the businesses maintains its own checkbook, and if money or funds is used by one company in support of another, it is all accounted for. *Id.* at 173:12-174:2.

200.    Waggoner, on behalf of YCC, engaged in a variety of handshake deals without proper documentation. *See id.* at 112:4-9, 95:25, 132:15, 178:13-6, 180:14-17.

201.   One such off-the-record deal was Waggoner's payment of the Millers' health insurance premiums, for which there existed no formal documentation despite these payments lasting years. *See id.* at 113:13-20.

## IV.   DISCUSSION

### A.  Applicable Standard

When conducting a bench trial, the Court is to find the facts and state the conclusions of law separately. Fed. R. Civ. P. 52(a)(1). "The findings or conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *Id.* In this civil case, Plaintiffs have the burden of proving their claims by a preponderance of the evidence, or in other words show that it is "more likely than not" that they should prevail. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983). But if the facts and evidence are equal towards both parties, Plaintiffs will fail to meet their burden. *See Greenwich Collieries v. Dir., Office of Workers' Comp. Programs*, 990 F.2d 730, 736 (3d Cir. 1993) (quoting *Burch v. Reading Co.*, 240 F.2d 574, 579 (3d Cir. 1957)).

### B.  Successor Liability against YCC

Plaintiffs bring claims against Defendants under the theory of successor liability. Normally, the purchase of a company's assets does not automatically anoint the new company as the successor to the old. *See Berg v. Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) ("The ordinary rule of successor liability is rooted in corporate law, and it states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets."). As discussed in the Court's previous summary judgment decisions, this case brings an exception to this general rule specific to ERISA. *See* MSJ, ECF No. 65 at 11 ("[A] purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important

federal statutory policy." (quoting *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 98 (3d Cir. 2011))).

Congress enacted ERISA to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 193 (3d Cir. 2009) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)). "Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it." *Id.* (quoting *Pension Benefit Guar. Corp.*, 467 U.S. at 720) (internal quotation marks omitted).

Later, Congress amended ERISA by passing the MPPAA. The MPPAA "mandates that an employer withdrawing from a multiemployer pension plan pay 'withdrawal liability,' which is equivalent to the employer's proportionate share of the plan's unfunded vested benefits." *Local Union 1158 I.B.E.W. Pension Fund-PA v. H.H. Fluorescent Parts, Inc.*, Civ. A. No. 06-5171, 2008 WL 544675, at *4 (E.D. Pa. Feb. 27, 2008) (citing 29 U.S.C. §§ 1381, 1391).

In *Einhorn v. M.L. Ruberton Constr. Co.*, the Third Circuit provided two elements that must be met for "a purchaser of assets [to be] liable for a seller's delinquent ERISA fund contributions." 632 F.3d at 99. First, the buyer must have "had notice of the liability prior to the sale." *Id.* Second, there must be "sufficient evidence of continuity of operations between the buyer and seller." *Id.* Plaintiffs must be able to satisfy both elements for successor liability to be assessed on Defendants.

### C. Actual Notice

As to the first *Einhorn* element—actual notice— the Court has previously determined that Plaintiffs have satisfied this element. *See* MSJ, ECF No. 65 at 11-17. "Notice can be proven not

26

only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Teamsters Local 469 Pension Fund v. J.H. Reid Gen. Contrs.*, Civ. No. 15-06185, 2020 WL 6129590 at *6 (D. N.J. Oct. 16, 2020) (quoting *Upholsters' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990)). It is undisputed that YCC received the notice of the Withdrawal Liability in May 2018. MSJ, ECF No. 65 at 12. The Asset Purchase Agreement was later memorialized and finalized on July 3, 2018. Joint Ex. 15 – 000007. Accordingly, Plaintiffs have met the first element of the *Einhorn* factor test by showing that YCC was on sufficient notice.

### D. Substantial Continuity of Operations

To satisfy the second element of the *Einhorn* test, Plaintiffs must demonstrate that there was a substantial continuity of operations. The Third Circuit, in *Einhorn*, enumerated five factors to consider in determining substantial continuity: (1) continuity of the workforce; (2) management; (3) equipment and location; (4) completion of work orders begun by the predecessor; and (5) constancy of customers. *Einhorn*, 632 F.3d at 99. However, "[t]he factors are non-exhaustive. Instead, the continuity inquiry is fact-specific and should be based on the totality of the circumstances." *RP Baking LLC v. Bakery Drivers & Salesmen Local 194 & Indus. Pension Fund*, Civ. A. No. 10-3819, 2012 WL 1079649, at *7 (D.N.J. Mar. 30, 2012) (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987)). Below is the Court's analysis of these five factors based on the above-determined findings of fact.

### 1. *Einhorn* Factor One: Continuity of Workforce

Previously, the Court decided that the continuity of workforce factor weighs against the finding of substantial continuity of operations. MSJ, ECF No. 65 at 18. This initial determination was made with the understanding that there was only one employee, Dennis Shaull, who was hired

from The York Concrete Company. *Id.* His primary job responsibilities changed with his new position. *Id.* However, after considering the findings of fact, there are other relevant facts that the Court must now analyze.

When assessing the continuity of the workforce factor, courts consider both the retention of the predecessor's employees and the current composition of the successor's workforce. *See Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 152 (3d Cir. 2014). As presented during the bench trial, Waggoner brought over all of the employees from the predecessor company. Tr. Trans. at 78:23-79:14. Although the parties originally thought there was only one employee, there were two employees who worked at The York Concrete Company; besides Mr. Shaull, The York Concrete Company also employed Robert McClung. *See id.* at 32:8-18.

In accordance with the Asset Purchase Agreement, Waggoner offered employment to these individuals. *See* Joint Ex. 15 at DF York Concrete – 000014. Mr. McClung was "kept on as a batch man" which implies that he had a similar position at the successor company. *See* Tr Trans. at 79:1-3. Also, Mr. Shaull continued to perform work as a truck driver/mechanic and spent significant time at the concrete facility. *Id.* at 85:22-86:5; *See also* Miller Dep. Tr. 54:16-17, 55:3-7.

Although Waggoner hired 100 percent of The York Concrete Company's workforce, this is mitigated by the fact that both employees were not maintained long-term. Mr. McClung was initially hired by YCC, but he worked less than one year for Waggoner Construction. Tr. Trans. at 79:1-14. With only one of the two employees remaining under Waggoner's employ, there is currently only a 50 percent retention of the predecessor's employees. Additionally, at the time of the bench trial, YCC had a total of 30 employees which included Mr. Shaull. The percentage of employees who worked at the predecessor company is statistically negligible when compared to the current composition of employees. Because there is only one employee from the predecessor

28

company that was retained by YCC, the Court finds that the continuity of workforce factor weighs against a finding of substantial continuity of operations.

### 2. Einhorn Factor Two: Continuity of Management

Next, the continuity of management factor also weighs against a finding of substantial continuity. At the time of the sale, The York Concrete Company did not have any active managers. MSJ, ECF No. 65 at 19. Waggoner did not implement a management team following the transfer of ownership. *See* Tr. Trans. at 90:19-21. There was a change in ownership of the company when the assets were transferred to Waggoner, but this did not completely eliminate the Millers' involvement with the company.

As indicated in the Asset Purchase Agreement, YCC continued to maintain the cooperation and services of the Millers. Joint Ex. 15 at DF York Concrete – 000013. Indeed, Waggoner and Waggoner's entities continued to make regular payments to Fred Miller which increased in value over time and persisted until May 2023. *See* Tr. Trans at 112:13-24. Waggoner also paid for the Millers' healthcare premiums even though they were not employees. *See id.* at 113:9-12. However, the payments and healthcare coverage do not make the Millers members of the Waggoner Entities. They were not designated as employees, nor did they serve in any managerial capacity.

As further revealed in his deposition, Mr. Miller admits that he continued to provide Waggoner with advice and guidance on how to better run YCC. *See* Miller Dep. Tr. at 50:7-16. This advice included the idea of selling concrete to former customers. *See id.* While this may contribute to the constancy of customers factor, this fact does not persuade the Court as to the continuity of management factor. Overall, before the sale of assets, the Millers were ultimately in charge of production; however, after the sale, they were—at most—relegated to an unofficial advisory role where Waggoner was directly supervising the production of concrete. After the sale,

there was no continuity of management, and this factor weighs against substantial continuity of operations.

### 3. Einhorn Factor Three: Continuity of Equipment and Location

At summary judgment, the Court found that this factor weighed in favor of finding substantial continuity of operations. MSJ, ECF No. 65 at 19. After assessing the findings of fact, the Court again concludes that this factor strongly favors this finding.

Prior to the acquisition, Waggoner did not have any capacity to produce concrete. *See* Tr. Trans. 59:12-14. His entire purpose in purchasing all the assets of The York Concrete Company was to add concrete manufacturing capabilities to his repertoire of businesses in order to increase their abilities to improve real estate. *See id.* at 156:13-18. Also, YCC did not have any concrete producing assets or equipment before the asset purchase. *Id.* at 92:5-10.

Based on the Asset Purchase Agreement, Waggoner purchased all of the inventory, equipment, and intangible assets that The York Concrete Company possessed. Joint Ex. 15 at DF York Concrete – 000007. In doing so, Waggoner began to utilize these assets in the production of concrete. At the time of purchase, The York Concrete Company was able to produce some form of concrete, albeit these capabilities were limited. Tr. Trans. at 129:22-24.

Although Defendants emphasized the inadequate conditions of the plant, including broken down equipment and unsanitary conditions, Waggoner agreed to purchase the assets and real estate of The York Concrete Company for $650,000. *See id.* at 75:20-22. Additionally, Waggoner personally inspected the conditions of the property before completing the asset purchase, and in the Asset Purchase Agreement, he agreed that he was "satisfied" with the condition of the equipment. *See* Tr. Trans. at 69:16-17, 93:6-23, 131:13-15, 159:16-160:9; s*ee also* Joint Ex. 15 at DF York Concrete – 000010.

Although Waggoner endeavored to complete renovations throughout the plant and the equipment, the original assets that he purchased from The York Concrete Company served as the starting point and the crux of his efforts to produce concrete. Waggoner's renovations no doubt substantially improved the working capacity of the concrete plant. Before the purchase, the plant was able to produce about 10 yards of concrete per day. Tr. Trans. 147:9-16, 168:5-7. Now, the plant can produce about 80 yards per day. *Id.* at 147:13-16. However, the Court does not find this to be applicable to the continuity of equipment and location factor.  At the heart of the matter, Waggoner still uses the same location and much of the same equipment as The York Concrete Company to conduct business, though now the plant and its equipment has been upgraded so as to produce a greater volume of concrete. Accordingly, this factor strongly leans in Plaintiffs' favor.

### 4.  Einhorn Factor Four: Completion of Work Orders Begun by Predecessor

Initially, when examining whether the fourth factor—completion of work orders—weighs in favor of Plaintiffs or Defendants, the Court noted that there was no evidence of any work orders. MSJ, ECF No. 65 at 20. Since that time, the parties conducted a deposition of Mr. Miller. During that deposition, it was revealed that contractors who owed funds to The York Concrete Company would make payments out to YCC, and that Waggoner would forward those funds to Mr. Miller. *See* Miller Dep. Tr. 87:24-88:9. Although this demonstrates that The York Concrete Company still received an income, this evidence is not relevant as to whether YCC completed any previously initiated work orders. This fact only suggests that the payment for the previously completed work was delayed. This factor continues to be neutral in terms of support for Plaintiffs' showing of substantial continuity of operations.

### 5.  Einhorn Factor Five: Constancy of Customers

At the time of summary judgment, the Court noted that it was unclear how the fifth factor—constancy of customers—weighs in determining whether there was a substantial continuity of operations. MSJ, ECF No. 65 at 20. However, after ascertaining the facts from the bench trial and the parties' submissions, the Court concludes that this factor weighs in favor of finding substantial continuity.

Pursuant to the Asset Purchase Agreement, Waggoner purchased all of the assets from The York Concrete Company. This included the customer lists and customer records. *See* Joint Ex. 15 at DF York Concrete – 000008. The Asset Purchase Agreement also contained a covenant that prohibited competitive business practices between The York Concrete Company and YCC, thus preventing The York Concrete Company from soliciting its former customers for five years. *Id.* at DF York Concrete – 000014. Additionally, the Asset Purchase Agreement mandated The York Concrete Company to reassure its customers that the customer relationships would not be terminated or adversely changed. *See id.* at DF York Concrete – 000010-13; Tr. Trans. at 76:5-14.

After the closing of the asset sale, YCC continued to do business with The York Concrete Company's former customers. These customers reached out to YCC to fulfill their concrete needs, as they did with The York Concrete Company before. In total, four of the five previous customers used YCC for concrete. Tr. Trans. at 71:2-23, 72:6-12, 167:3-7. While The York Concrete Company did not have many customers before selling its assets, eighty percent of the customers it did have utilized YCC for concrete.

Defendants note in their Proposed Findings of Fact and Conclusions of Law that much of YCC's orders are initiated by Waggoner's entities. ECF No. 129 at 30. In fact, they contend that the former customers only bought a total of $100,000 worth of concrete of the roughly $10,000,000 YCC did in sales in 2023. *Id.* However, this comparison is flawed. The continuity of customers

factor is not about the amount of business that the former entity's customers produced in comparison to the business's total revenue. *See Indiana Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 782 (7th Cir. 2018) (rejecting defendant's argument that the constancy of customers analysis should focus on the percentage of total revenue deriving from former entity's customers). Rather, this factor accounts for the number of former customers that now utilize YCC. Although, in this case, there is a small sample size, most customers did transfer over to YCC. *See* Tr. Trans. at 71:2-23, 72:6-12, 167:3-7. Additionally, Waggoner continued to advertise and serve the same community that The York Concrete Company serviced. Specifically, YCC's website states "We proudly serve York County and the surrounding areas." *See* Tr. Trans. at 96:24-97:1. With Waggoner serving the same four customers and the same greater community, this factor weighs towards a finding of substantial continuity of operations.

### 6.  Additional Considerations

During summary judgment, the Court noted that additional considerations lean towards the finding of substantial continuity of operations. *See* MSJ, ECF No. 65 at 21. The *Einhorn* factors are non-exhaustive and other relevant considerations can be factored into the analysis. *See RP Baking*, 2012 WL 1079649 at *7 (D.N.J. Mar. 30, 2012) (citing *Fall River*, 482 U.S. at 43) ("[T]he continuity inquiry is fact-specific and should be based on the totality of the circumstances.").

Here, YCC continues to use the same trade name, telephone number, and location as The York Concrete Company. Tr. Trans. at 78:17-22.  Additionally, YCC's website states that the company was "established in 1944" and "is the first and oldest mix concrete company." *See* Joint Ex. 16. The signage outside the company states "Pouring Mud Since 1944." *See* Tr. Trans. at 73:25-74:7. Also, Waggoner specifically stated that the advertisement of this connection was important because The York Concrete Company built a great name for itself in the area, and he wanted to

capitalize on this. *See* Tr. Trans. at 74:8-17. Taking into account these additional facts, it is clear that Waggoner deliberately held YCC out to the general public as a continuation of The York Concrete Company, and thus these facts also weigh in favor of the finding of a substantial continuity of operations.

Overall, based on the five enumerated *Einhorn* factors and the additional facts the Court has now considered, the Court finds that there was a substantial continuity of operations from The York Concrete Company to YCC. Because there was adequate notice given and there was a substantial continuity of operations, Plaintiffs have successfully established successor liability against YCC.

### E.  Liability

#### 1.  Controlled Group Liability

During summary judgment, the Court found that the Waggoner Entities, which includes YCC, are under the common control of Waggoner within the meaning of ERISA and MPPAA. *See* MSJ, ECF No. 65 at 23-25. The Court also noted that if Plaintiffs were to prevail, finding withdrawal liability, then controlled group liability would attach. *Id.* at 24. Accordingly, based on the finding that YCC is liable for The York Concrete Company's Withdrawal Liability, Waggoner Entities are jointly and severally liable for now YCC's withdrawal liability.[2]

#### 2.  Alter Ego Theory

Plaintiffs further contend that Waggoner, in his personal capacity, is liable for the liabilities of YCC and the other Waggoner Entities under the alter ego theory. *See* Am. Compl. (ECF No. 23) at 13, 16. The parties did not move for summary judgment on this count. *See* MSJ, ECF No. 65 at

---

[2] Waggoner Entities are also jointly and severally liable for Plaintiffs' attorney's fees and costs as mandated by ERISA.

3. Accordingly, the Court now evaluates Plaintiffs' alter ego argument based on the facts presented at trial and the parties' submissions and determines that Plaintiffs have met the standard to pierce the corporate veil.

Federal courts will pierce the corporate veil to remedy abuses of the corporate form. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001). However, there is no "rigid test" as to when the veil should be pierced. *Trs. of Nat'l Elevator Indus. Pension Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). Instead, the Third Circuit requires that courts evaluate several factors including whether there was: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Id.* (quoting *Pearson*, 247 F.3d at 484-85). However, none of these factors are dispositive and the courts will evaluate the totality of the circumstances. *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018).

Previously, courts have found veil piercing appropriate to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967). However, in Pennsylvania, there is a strong presumption not to pierce the corporate veil. *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). Still, a court can pierce the corporate veil in extraordinary circumstances. *See Wedner v. Unemp't Comp. Bd. of Review*, 296 A.2d 792, 794 (Pa. 1972) ("The corporate entity or personality will be disregarded [o]nly when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." (internal citation omitted)). Moreover, "whenever an owner . . . use[s] control of a corporation to further their personal interests, the

fiction of the separate corporate identity may be disregarded." *Mortimer v. McCool*, 255 A.3d 261, 278 (Pa. 2021) (citing *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978)). Accordingly, "the basis for piercing the corporate veil must be 'shown by clear and convincing evidence.'" *Trinity Indus., Inc.* 903 F.3d at 366 (quoting *Lutyk*, 332 F.3d at 192).

In this case, Waggoner is the sole owner of YCC and fully controls Waggoner Entities along with all its incorporated companies. *See* Joint Ex. 6; Tr. Trans. at 106:21-23; Tr. Trans. at 118:3-10. Additionally, he does not need any approvals for making withdrawals or contributions to YCC. *See* Tr. Trans. at 118:11-13, 119:6-8. Indeed, he is not subject to any oversight in his decisions regarding YCC. *See Id.* at 120:3-9, 120:16-18. Waggoner is in complete control of all the finances, and his compensation is not subject to approval by anyone. *Id.* at 119:11-20. However, each business maintains separate financing, and when money is moved between entities, it is properly accounted for. *Id.* at 173:12-174:2.

Given these facts, as delineated more fully in the findings of fact section, Waggoner had the ability to move money in and out of the various entities without any oversight. However, there is zero evidence or any suggestion that Waggoner took money out of the companies. Plaintiffs further suggest that Waggoner regularly intermingled his personal money with that of Waggoner Entities. ECF No. 128 at 67. Conversely YCC's Chief Financial Officer testified that Waggoner might have put money into the company once or twice a year. *See* Tr. Transcript 118:22-119:2. Once or twice does not amount to a regular occurrence or indicate that Waggoner's personal finances were constructively intermingled with that of the Waggoner Entities. Also, there is no suggestion that any type of corporate undercapitalization took place regarding the Waggoner Entities.

Without a doubt, all of the Waggoner Entities are intermingled with each other. Initially, when Waggoner set up his subsidiary companies, they did not have employees; instead, Waggoner Construction acted as a bank by loaning workers. *See id.* at 81:18-82:6, 98:3-10, 107:17-20, 174:25-175:4, 176:2-10. Additionally, all the Waggoner Entities share the same official address, their finances are intermingled, and they have a singular profit-sharing agreement. *See id.* at 161:18-162:1, 98:11-14, 100:17-101:1, 98:15-20. Although the entities are intermixed and there is some evidence showing that Waggoner disregarded some corporate formalities, these factors alone are not enough to justify piercing the corporate veil.

However, it is appropriate to pierce the corporate veil to prevent a wrong. *See Wedner*, 296 A.2d at 794. Here, when Waggoner initially went to purchase The York Concrete Company, he did so via a handshake deal. *See* Tr. Trans. at 132:8-17. In early 2018, he began renovating the concrete plant in order to improve the facilities. The renovations were complete in May 2018, and around this time, Mr. Miller informed Waggoner about the Withdrawal Liability. *See id.* at 136:21-23; *see* Waggoner Sept. 2021 Dep. Tr. at 141:20-142:22. In response, Waggoner indicated that he had no intention to pay the Withdrawal Liability assessment. *See* Waggoner Sept. 2021 Dep. Tr. at 141:25-142:22. Waggoner did not memorialize the asset purchase until after he completed the renovations and was informed about the Withdrawal Liability. *See* Joint Ex. 15 at DF York Concrete – 000007. Indeed, Waggoner admitted during the bench trial that he set up his companies in order to avoid liabilities. *See* Tr. Transcript 66:18-67:6. Also, during his previous deposition, he further explained that Waggoner Construction did not purchase the assets of The York Concrete Company to avoid liability. Waggoner May 2023 Dep. at 27:17-19. With these facts taken together, it appears that Waggoner only memorialized the asset purchase with YCC as the purchaser so that he could avoid personal liability regarding the Withdrawal Liability.

Thus, it is clear that Waggoner utilized YCC during the purchase of The York Concrete Company's assets for his own personal gain beyond what he would have received from the original handshake deal.  It is wrong and unjust for Waggoner to escape liability for intermingling his personal interest with that of his companies by hiding behind the veil of the corporate form. *See Coll. Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 207 (Pa. 1976) (finding it proper to pierce the corporate veil when the corporation's interests are intermingled with personal interests).  Not piercing the corporate veil here would set a precedent for anyone to establish a company in order to avoid a known liability that he or she would have acquired had the company not been formed. Accordingly, the Court finds that it is in the interests of justice and public policy to pierce the corporate veil in this circumstance, and that not doing so could unwarrantedly limit the recovery rightly available to Plaintiffs.

### F.  Requested Relief

The Court has found for Plaintiffs and determined that all Defendants, including Waggoner in his personal capacity, are jointly and severally liable.  Plaintiffs are entitled to the requested relief including the Withdrawal Liability, interest on all amounts due, liquidated damages, attorneys' fees, and other costs and expenses.

#### 1.  Withdrawal Liability, Liquidated Damages and Interest of Initial Judgment

According to ERISA Section 4301(b), 29 U.S.C. § 1451(b), failure to make withdrawal liability payments when due shall be treated as a contribution delinquency under ERISA Section 515, 29 U.S.C. § 1145. ERISA Section 502(g)(2) states:

> In any action . . . by a fiduciary . . . on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan (A) the unpaid contributions; (B) interest on the unpaid contributions; (C) an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent . . . ; (D) reasonable attorney's fees and costs of the action, to be paid by

the defendant; and (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

In the previous case, the Court entered default judgment against YCC Holdings Company in the amount of $278,978.90. *Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company*, Case No. 19-cv-00266 at ECF No. 11. This amount consisted of: (1) withdrawal liability in the amount of $193,363.00; (2) interest in the amount of $11,972.40; (3) liquidated damages in the amount of $38,673.00; (4) attorneys' fees and costs in the amount of $34,970.50. *See id*. Now that this Court has found all Defendants jointly and severally liable for the previous judgment, the Fund is entitled to recover the $278,978.90 judgment from the current Defendants.

### 2.  Pre and Post-Judgment Interest

Additionally, Plaintiffs are seeking pre and post-judgment interest. According to ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2)(B), when a judgment in favor of a plan is awarded, the court shall award "interest on the unpaid contributions." The Third Circuit has left the determination of prejudgment interest to the discretion of the district courts. *See Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 207 n.20 (3d Cir. 2004). However, "[a]s a general rule, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of the money which was legally due." *Del. River & Bay Auth. v. Kopacz*, 584 F.3d 622, 634 (3d Cir. 2009) (quoting *Skretvedt*, 372 F.3d at 208). Here, as the Court noted in the previous default judgment, Plaintiffs were entitled to prejudgment interest. Specifically, Plaintiffs requested, and the Court awarded prejudgment interest at 6%. *See Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company*, Case No. 19-cv-

00266 at ECF Nos. 4 and 11. Accordingly, the Court again orders prejudgment interest at 6% which shall run from the date of judgment of the initial action (July 22, 2019) through the date of judgment in this action.

In addition to prejudgment interest, Plaintiffs also request post-judgment interest. 28 U.S.C. § 1961(a) states that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Post-judgment interest was previously ordered in the initial action. *See Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company*, Case No. 19-cv-00266 at ECF No. 11. Accordingly, in this case, post-judgment will be granted at the rate set forth in 28 U.S.C. § 1961 from the date of this judgment until it is satisfied.

### 3. Attorneys' Fees and Costs

Finally, Plaintiffs seek attorney's fees and costs. In the previous judgment, the Court ruled that Plaintiffs were entitled to additional reasonable attorney's fees and costs. *Central Pennsylvania Teamsters Pension Fund, et al. v. YCC Holdings Company*, Case No. 19-cv-00266 at ECF No. 11. Also, under ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2)(D), Plaintiffs are entitled to "reasonable attorney's fees and costs of the action."

In the Third Circuit, there is a two-part test used to determine if attorney fees are to be awarded in ERISA cases. *See Templin v. Indep. Blue Cross*, 785 F.3d 861, 864 (3d Cir. 2015). "First, a court must determine whether the moving party is eligible for such an award." *Id.* In this case, Plaintiffs are the prevailing party and have indeed achieved "some success under the ERISA statute." *Id.* Next, the Court must consider the factors set forth in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir.1983). *Templin*, 785 F.3d at 864 (listing *Ursic* factors: "(1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees; (4) the benefit conferred

upon members of the pension plan as a whole; and (5) the relative merits of the parties' positions.").

Accordingly, Plaintiffs shall submit a petition setting forth the reasonable fees and costs incurred

throughout the lifecycle of this case and rationale as to why the Court should award attorney's fees

and costs paying particular mind to the *Ursic* factors.

## V.    CONCLUSIONS OF LAW

1.    Defendants received sufficient notice of the Withdrawal Liability, and Plaintiffs satisfied this element required for successor liability.

2.    As contended by Plaintiffs, there is sufficient evidence to prove substantial continuity of operations from The York Concrete Company to YCC, and Plaintiffs satisfied this element for successor liability.

3.    Overall, Plaintiffs met their burden to establish both elements necessary for successor liability against YCC, and YCC is liable for the Withdrawal Liability.

4.    All of Waggoner Entities are under common control and are jointly and severally liable for YCC's liability.

5.    Plaintiffs met their burden to pierce the corporate veil and establish personal liability against Waggoner, and Waggoner is personally liable for YCC's liability.

6.    Plaintiffs are entitled to recoupment of the initial judgment and pre- and post-judgment interest. Plaintiffs can also petition for attorney fees and costs.

7.    Accordingly, judgment is entered in favor of Plaintiffs and against all Defendants. An appropriate Order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

41